999 F.2d 655
 Donald A. MINER, Plaintiff-Appellee,
v.
CITY OF GLENS FALLS, Defendant-Appellant,
Glens Falls Police Department; Board of Public Safety of
the City of Glens Falls; Francis X. O'Keefe, as
Mayor of the City of Glens Falls; James
Duggan, Defendants.
 No. 1400, Docket 92-9370.
 United States Court of Appeals,
Second Circuit.
 Argued April 23, 1993.
Decided July 26, 1993.
 
 Steven U. Teitelbaum, Albany, NY, for plaintiff-appellee.
 Joseph R. Brennan, Glens Falls, NY (McPhillips, Fitzgerald & Meyer, New York City, of counsel), for defendant-appellant.
 Before PRATT and JACOBS, Circuit Judges, and KNAPP, District Judge.*
 JACOBS, Circuit Judge:
 
 
 1
 Plaintiff-appellee Donald Miner, a former police officer in the City of Glens Falls, New York, brought this action pursuant to 42 U.S.C. § 1983 (1988) asserting a claim for the alleged deprivation of his property interest in his job without due process of law. Miner was discharged, without a hearing, after he formed a religious scruple against carrying a firearm. The United States District Court for the Northern District of New York (Munson, J.) granted summary judgment in Miner's favor on the issue of liability, and awarded monetary damages in an amount to be determined by bench trial. Following the damages trial, the district court entered its decision and order, dated November 12, 1992, awarding damages to compensate Miner for his lost wages, lost pension benefits and emotional distress, together with attorney's fees, pre-judgment interest and costs. It is the latter determination, regarding damages, that the City of Glens Falls (the "City" or "Glens Falls") challenges on appeal.
 
 
 2
 On appeal, Glens Falls argues that Miner would have been fired even if the City had conducted a hearing and that Miner therefore is entitled only to nominal damages for the denial of his right to due process and is not entitled to any recovery for lost wages, lost pension benefits or emotional distress. In other words, the City contends that Miner failed to meet his burden of proving that the deprivation of his due process rights was the cause of his termination. The City also contests the award of pre-judgment interest. For the reasons that follow, we affirm the district court's award.
 
 BACKGROUND
 A. City Government
 
 3
 Under the City Charter, the Glens Falls Board of Public Safety (hereinafter sometimes the "Board") has "custody and management, including disposition and discipline," of the Glens Falls Police Department, and has the power and obligation to "prescribe the duties, ordain, promulgate and enforce proper rules, regulations and orders for the good government and discipline" of the Department. The six members of the Board of Public Safety are appointed to three-year terms by the Mayor, who occupies the seventh seat ex officio, and serves as chairman. The Mayor, as the City's chief executive officer, has the power "to call out and command" the police. The Mayor has no authority to dismiss a police officer, although the Glens Falls Charter confers upon the Mayor the power to suspend any City employee, "upon charges being preferred," until the Board "shall convene and take action in the matter, providing however, that such person shall not remain so suspended for a period longer than fifteen days, without an opportunity of being heard in his defense."
 
 B. Miner's Discharge
 
 4
 For twenty years beginning in 1966, Donald Miner was employed by the Glens Falls Police Department. In 1979, Miner became a Jehovah's Witness and, in 1983, Miner formed the conviction that he could not work in any capacity that might require him to take the life of another human being or to carry or use a firearm. Miner understood, however, that he could not disobey the lawful order of a superior, and he concluded that if given a direct order to carry a gun he would be compelled to resign from his job.
 
 
 5
 At the time Miner formed his conviction not to carry a firearm, the Board of Public Safety adopted "Resolution 11", which reassigned Miner, by then a line sergeant, to the staff position of Training Officer. As Training Officer, Miner was required to assist Police Chief James Duggan in the exercise of his managerial responsibilities; Miner was not required to carry or use a weapon. Approximately two years later, in 1985, Chief Duggan removed Miner from this position (a seemingly unauthorized derogation of Resolution 11) and re-assigned him to line sergeant's duty, on the midnight shift. Duggan, who was aware of Miner's religious convictions, did not order Miner to carry a firearm.
 
 
 6
 On December 31, 1985, the Board passed "Resolution 50" requiring that all police personnel carry firearms at all times while on duty. At no time, however, did Chief Duggan order Miner to carry a firearm. (In fact, Duggan himself did not carry a firearm at all times while on duty.) Rather, after Resolution 50 was adopted, Duggan permitted Miner to remain with the police force through May or June of 1986 to enable him to complete 20 years of service and thereby increase his pension. Duggan also told Miner that if he would thereafter resign from the Police Department he would be offered a civilian job. Miner, who at this time was not carrying a gun and had not been ordered to do so, came to believe that the Board--which had recommended that Miner continue working without a gun so that he could complete his 20 years with the police force--might indefinitely waive the firearm requirement in his case. In any event, Miner decided that he would not resign unless Duggan's offer of continued employment was presented in writing. No such written offer was made, and Miner did not resign.
 
 
 7
 On July 7, 1986, the Board adopted "Resolution 34" authorizing Mayor Francis O'Keefe to inform Miner that his "present position" with the police department would be "abolished" on August 31, 1986. The Mayor, in turn, sent Miner two essentially identical letters, thanking Miner for his dedication to the Police Department over many years of service and notifying him that, pursuant to Resolution 34, his "status" would be "terminated" as of August 31, 1986: "The reason for this action is as outlined in Resolution # 50, December 31, 1985 requiring all Police to carry firearms. You have refused to carry a weapon, mainly, I believe, because of your religious beliefs."
 
 
 8
 Despite the Mayor's letters to him, Miner insisted that the Board itself did not intend that he be dismissed from the police force. Miner perceived that Resolution 34, which abolished his "present position", was ambiguous because the last Board resolution addressing Miner's status had assigned him to the "position" of Training Officer. Miner therefore believed that Resolution 34 had abolished the position of Training Officer without affecting his position as line sergeant. Since the Mayor's letter presumed that the Board did intend to fire Miner, and since Miner disagreed, Miner asked Mayor O'Keefe for the opportunity to address the Board of Public Safety. Mayor O'Keefe denied the application without informing the Board that Miner requested a hearing. In this manner Miner was discharged.
 
 
 9
 Miner promptly filed an unemployment insurance claim. Benefits were granted upon a finding by the New York State Department of Labor that he was involuntarily discharged under non-disqualifying circumstances. In addition, Miner applied for and received public assistance, in the form of food stamps, heat benefits and Medicaid. Miner also commenced an action in New York State Supreme Court, which he subsequently discontinued in order to pursue this federal action.
 
 C. Federal Court Proceedings
 
 10
 In his federal complaint, filed on July 27, 1989, Miner alleged that he was dismissed from his job in violation of the United States Constitution, the New York State Constitution, the New York Civil Service Law and a collective bargaining agreement between the City of Glens Falls and the Glens Falls Police Benevolent Association. Miner further alleged that he had "been damaged as a result of the actions of the defendants." Miner sought judgment against the defendants in the sum of $1.5 million in damages, such other and further relief as may be just and proper, together with costs, disbursements and attorney's fees.
 
 
 11
 Following discovery, Miner moved for summary judgment on his complaint. The February 25, 1991 motion was supported by affidavits of Miner and his counsel. Attached to these affidavits were transcripts of depositions given by the members of the Board of Public Safety: Mayor O'Keefe, Chief Duggan, John Paquin, Thomas Hewitt, Louis Hoffis and Richard Saunders. (One member of the 1986 Board died before this action was commenced.)
 
 
 12
 The defendants opposed Miner's motion for summary judgment on the limited grounds (1) that Miner voluntarily resigned from the police force, and therefore had not been involuntarily terminated; and (2) that Miner's election to proceed under the terms of a collective bargaining agreement constituted a waiver of the procedures guaranteed by the New York State Civil Service Law. The defendants interposed no other defense on summary judgment to Miner's claim that he suffered damages directly caused by the violation of his due process rights. Nor did the defendants contest the following material facts adduced by Miner in support of his summary judgment motion: (1) that Miner was never given a direct order to carry a weapon to conform his conduct to Resolution 50; (2) that no charges of misconduct were ever filed against Miner; (3) that Miner was never served with a notice of discipline, as required under the collective bargaining agreement between the City of Glens Falls and the Glens Falls Police Benevolent Association; (4) that Miner was never provided with a pre-termination hearing, as required by New York Civil Service Law Section 75, either for incompetency or for misconduct; (5) that, in accordance with New York Civil Service Law Section 75, the Board of Public Safety was the body that would have conducted Miner's pre-termination hearing had there been one; (6) that, despite the passage of Resolution 50, Miner was permitted to serve in the Police Department without carrying a firearm so that he could complete his 20 years of service; (7) that, upon learning that he was to be discharged, Miner asked Mayor O'Keefe for permission to be heard by the Board of Public Safety; and (8) that Mayor O'Keefe denied Miner's request for a hearing.
 
 
 13
 Miner's summary judgment motion also relied upon the following uncontradicted testimony of the individual members of the Board of Public Safety. Board member Louis Hoffis had voted for Resolution 34 with the understanding that Miner would be removed as Training Officer but would remain a police officer for the City. Mr. Hoffis recalled that the Board members discussed the resolution in that framework, and that he learned of Miner's complete dismissal only upon reading about it in a newspaper. Board member Thomas Hewitt was not present when the Board adopted Resolution 34, which "terminated" Miner's "status", and could not say whether the Board intended by that resolution to dismiss Miner from the police department or merely to officially remove Miner from his position as Training Officer. Mr. Hewitt's personal understanding was that Resolution 34 merely terminated Miner's position as a Training Officer. Neither could Board member Richard Saunders determine whether the import of Resolution 34 was to terminate Miner's status as a police officer or only his status as a Training Officer. Mr. Saunders believed that Miner did not deserve to be terminated entirely; and the Mayor had assured Mr. Saunders that Miner was offered, but had declined, alternative civil employment. According to Board member John Paquin, the Board had directed the Mayor to offer Miner an alternate position with the City of Glens Falls. Mr. Paquin believed the Mayor had done so.
 
 
 14
 The district court granted Miner's motion for summary judgment based on (a) the submissions in support of and in opposition to the summary judgment motion and (b) the preclusive effect of the New York State Department of Labor's factual findings. The district court found that Miner did not elect to proceed under the terms of the collective bargaining agreement, and that he "was terminated from his position as a permanent civil servant without any of the due process mandated under Federal or State law." The court concluded that Miner "met his summary judgment burden of establishing that there is no genuine issue of material fact regarding any element of his Section 1983 claim for deprivation of property without due process of law." Specifically, Senior Judge Munson ordered that judgment be entered in Miner's favor on the liability aspect of the case, and that Miner be awarded monetary damages in an amount to be determined. The issue of damages was set down for a bench trial.
 
 
 15
 At the two-day damages trial, Miner testified concerning the nature and extent of his actual injuries, and sponsored the testimony of three other witnesses, including his wife, on the same subject. The defendants introduced no evidence at the damages trial other than certain excerpts from the Glens Falls City Charter, offered for the purpose of establishing the authority and composition of the Board of Public Safety and the duties and responsibilities of the Mayor of Glens Falls.
 
 
 16
 At the conclusion of the damages hearing, the district court found that the defendants were responsible for Miner's injuries and awarded Miner (1) $89,484 in lost wages, together with pre-judgment interest; (2) $57,244.68 in lost pension benefits; (3) $12,500 for emotional distress; (4) $36,395 in attorney's fees; (5) $2,746.25 in expert witness fees; (6) $2,112.20 in other costs; and (7) post-judgment interest. On appeal, the City objects to the district court's award of lost wages, lost pension benefits, emotional injury damages and pre-judgment interest.
 
 DISCUSSION
 A. Lost Wages and Pension Benefits
 
 17
 It is uncontested on appeal that the defendants violated Miner's due process rights. In dispute is the district court's finding that Miner's injuries were caused by the due process violation rather than by Miner's decision not to carry a firearm. Specifically, the district court found that Miner failed to prove that his termination was the result of the due process denial, but ruled that the burden shifted to the defendants because they made it impossible for Miner to prove such causation. Since the defendants "made no effort whatsoever" to prove causation, the district court concluded that Miner's damages "were caused by defendants' violation of his right to procedural due process and that he is therefore entitled to collect more than nominal damages."
 
 
 18
 We hold that the burden of proving causation never shifted to the defendants. We nonetheless affirm the district court's award of substantial damages because Miner proved the element of causation at the summary judgment stage of this proceeding.
 
 
 19
 "It is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury." McCann v. Coughlin, 698 F.2d 112, 126 (2d Cir.1983) (citations omitted). Absent a showing of causation and actual injury, a plaintiff is entitled only to nominal damages. See Carey v. Piphus, 435 U.S. 247, 263, 266-67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978) ("injury caused by a justified deprivation ... is not properly compensable under § 1983"; "the denial of procedural due process should be actionable for nominal damages without proof of actual injury."); Patterson v. Coughlin, 905 F.2d 564, 568 (2d Cir.1990) (citing Carey v. Piphus, 435 U.S. at 263, 98 S.Ct. at 1052, for the proposition that "unless the deprivation was caused by the violation the plaintiff is limited to nominal damages.").
 
 
 20
 In this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages. McCann v. Coughlin, 698 F.2d at 126. It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed. Id. We recognize a limited exception, under truly extraordinary circumstances: if the defendant prevents the plaintiff from obtaining access to evidence, and thereby makes it impossible for the plaintiff to carry the burden of proof, the burden shifts to the defendant to prove that the deprivation of plaintiff's liberty or property right would have occurred even if due process had been afforded. Patterson v. Coughlin, 905 F.2d at 570.
 
 
 21
 In Patterson, a prison inmate was charged with assaulting a guard. At the disciplinary hearing, inmate Patterson sought to offer the testimony of two other inmates, but the hearing officer prohibited Patterson from calling any witnesses in his defense. Patterson was found guilty and sentenced to confinement in a special housing unit. Although the defendants conceded that they violated Patterson's due process right to present witnesses, they moved for summary judgment to dismiss the complaint arguing that Patterson could not show that he would have been exonerated even if he had been allowed to call witnesses at the disciplinary hearing, essentially because no one could say what testimony would have been given at the hearing by the two absent witnesses. This Court concluded that the burden of proving causation at the § 1983 trial shifted to the defendants because they were responsible for the complete unavailability of one of the witnesses during both the disciplinary hearing and the § 1983 action, and because a second witness (based on that witness' testimony at his own disciplinary hearing) would have supported the plaintiff's version of events. Id. at 570.
 
 
 22
 The causation issue in Miner's case is whether the Board of Public Safety would have discharged Miner for his likely refusal to carry a firearm if ordered to do so. The district court concluded that the City made it impossible for Miner to establish causation "precisely because no pre-termination hearing was held." However, to treat that impossibility as the kind of impossibility that shifts the burden of proving causation would effectively remove a plaintiff's burden in every case, because the burden would shift presumably whenever due process was denied. It cannot be said that it was "impossible" for Miner to adduce proof of causation because the defendants impeded Miner's ability to do so. At the damages hearing, Miner was free to subpoena the Board members. There is no claim that the defendants procured their absence: Miner had previously deposed them. In that essential respect, this case is distinguishable from Patterson v. Coughlin, where the defendants were responsible for the loss of a witness and, consequently, responsible for the plaintiff's inability to carry his burden of proof at the § 1983 trial. Therefore, Miner's burden of establishing causation never shifted.
 
 
 23
 Miner shouldered his burden to prove causation by introducing extensive evidence on that issue on his motion for summary judgment. When the district court granted Miner's motion and "awarded monetary damages in an amount to be determined", Miner had reason to understand that the district court implicitly resolved the causation issue in his favor, and neither Miner nor the defendants proffered a single witness at the damages hearing regarding causation. We conclude that Miner was entitled to a judgment as a matter of law on that issue.
 
 
 24
 Appellate review of a district court's grant or denial of summary judgment is de novo. Hudson Hotels Corp. v. Choice Hotels Int'l, Inc., 995 F.2d 1173, 1175 (2d Cir.1993). As such, we apply the same legal standard as that employed by the district court pursuant to Federal Rule of Civil Procedure 56(c). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir.1985).
 
 
 25
 We do not hold that Glens Falls must hire or retain a police force of pacifists. The issue is limited to what the members of the Board would have done (as opposed to what they had the power to do) about Miner's likely refusal to carry a gun if ordered to do so. Miner's summary judgment motion contained deposition testimony on this issue. (The defendants chose not to cross-examine any of the Board members during their depositions.) That testimony firmly establishes that Mayor O'Keefe wanted to fire Miner, but that the Board--which had the sole power to discharge Miner--would not have terminated Miner if Miner had been given the opportunity to go before the Board. Miner had been a valued public servant for 20 years. He had never been cited for misconduct or incompetence and he had previously performed well at a desk job. The Board had resolved to accommodate Miner's decision to work without carrying a firearm, as shown by its recommendation that Miner be offered alternate civil employment if Miner himself found it necessary to resign from the force. The majority of Board members considered Miner deserving of City employment either with the Police Department or otherwise. With the exception of the Mayor and the Chief of Police, all of the surviving Board members believed that notwithstanding their passage of Resolutions 34 and 50 Miner would either remain on the police force without carrying a firearm or that his conscientious objection would be accommodated by placing him in another City job. Moreover, the Board had had no previous occasion to enforce Regulation 50, and Chief Duggan (one of six appointed Board members) admitted that he did not carry a firearm at all times while on duty (an apparent violation of Regulation 50). With full knowledge of these facts, Mayor O'Keefe, who was chairman of the Board of Public Safety, intentionally denied Miner's request for a pre-termination hearing and never told the Board that Miner requested a hearing. (Indeed, the Mayor assured at least one of the Board members that Miner was to continue working for the City.)
 
 
 26
 The record on summary judgment fully supports Miner's claim that he was deprived of his employment because of the violation of his procedural due process rights. The defendants did not dispute causation on that motion or raise a genuine issue as to any material fact affecting causation. Accordingly, the district court erred in not granting judgment as a matter of law on that issue.
 
 B. Pre-judgment Interest
 
 27
 The City contends that pre-judgment interest on the back pay should not have been awarded in this case because (1) Miner did not prove causation of damages; (2) the City did not receive a windfall by the use of Miner's unpaid salary; (3) the award of emotional damages already compensates Miner for the effects of the delayed payment; and (4) the district court, by taking fifteen months to issue its decision on damages, was responsible for much of the delay associated with the action. These arguments furnish no basis for reversal on appeal.
 
 
 28
 First, we have determined that Miner established the element of causation on his motion for summary judgment. Second, the district court awarded pre-judgment interest in order "to fully compensate plaintiff for actual damages incurred"; the district court found no countervailing inequity and, in that vein, noted that the City had "full use of the money which would have paid plaintiff's salary." Third, the district court's explanation that the award of pre-judgment interest was necessary to fully compensate Miner because he "has been deprived of the use of [his salary]" disposes of the City's argument that the interest award wholly or partially duplicates the award for emotional distress. Finally, the district court did not err when it determined the relative equities between Miner and the defendants without addressing the delay attributable to the functions of the court.
 
 C. Emotional Distress
 
 29
 It is settled that a court may award damages for emotional suffering in a § 1983 case. See Carey v. Piphus, 435 U.S. at 263-64, 98 S.Ct. at 1052. What is required is that the plaintiff "convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself." Id. at 263, 98 S.Ct. at 1052. "[G]enuine injury in this respect may be evidenced by one's conduct and observed by others." Id. at 264 n. 20, 98 S.Ct. at 1052 n. 20. If Miner had been fired for his conscientious inability to carry a weapon, he was evidently willing to accept the financial and emotional ramifications; but he was not for that reason required to bear any harm caused by the violation of his procedural rights.
 
 
 30
 According to Miner's testimony concerning emotional damages, he experienced feelings of inadequacy as a result of being unable to provide for his family, embarrassment while applying for public assistance in the presence of people he had encountered as a police sergeant, and stress at having to sell his newly purchased house. Miner further testified that he considered committing suicide because he felt "totally exasperated with the situation." Miner's wife testified about Miner's interactions with her and their children, and the tensions that evidently were caused by Miner's loss of his job.
 
 
 31
 The district court credited this testimony concerning "the mental anguish [Miner] felt after having been terminated by defendants," and concluded that "the proof demonstrates ... that plaintiff suffered emotional distress as a result of his termination in violation of due process." The district court awarded Miner $12,000 for emotional injury.
 
 
 32
 The City argues that Miner has not offered sufficient competent evidence to sustain the emotional damages award and, in support of this proposition, cites to the Seventh Circuit's decisions in Nekolny v. Painter, 653 F.2d 1164 (7th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982) and Biggs v. Village of Dupo, 892 F.2d 1298 (7th Cir.1990), and the Third Circuit's decision in Spence v. Board of Education, 806 F.2d 1198 (3rd Cir.1986).
 
 
 33
 In Nekolny v. Painter, the Seventh Circuit deemed insufficient the evidence of emotional distress offered by three different claimants where one stated merely that he was "very depressed," another that she was "a little despondent," and the third that he was "completely humiliated." 653 F.2d at 1172-73. Subsequently, in Biggs v. Village of Dupo, the Seventh Circuit emphasized that a plaintiff must show " 'demonstrable emotional distress,' not just point to circumstances of the constitutional violation which might support an inference of such injury," and rejected the claimant's "conclusory" testimony "that he was affected emotionally by being fired, and that he was concerned over 'the idea of my family going through it' " as being too "sparse" to furnish the necessary direct evidence of emotional distress. 892 F.2d at 1304-05. (citation omitted.) In Spence v. Board of Education, the district court ordered a remittitur of a jury's award for emotional distress where the evidence "consisted chiefly of plaintiff's own testimony that she was depressed and humiliated by the [deprivation] and that she had lost her motive to be creative." 806 F.2d at 1201. The Third Circuit affirmed the district court's order, emphasizing that the plaintiff offered no testimony (a) that her peers held her in diminished regard; (b) that she suffered physically from her emotional distress; (c) that she sought professional psychiatric counselling; or (d) that she suffered emotional distress resulting from the loss of income. Id.
 
 
 34
 Except for Miner's thought of suicide, the anguish he described has some objective correlation with events described by Miner and by his wife: loss of their house, family tensions, certain potentially demeaning aspects of a former police officer having to seek benefits, and so on. The district court properly considered these factors and awarded damages in an amount consistent with the magnitude of Miner's subjective injuries and within the district court's discretion.
 
 
 35
 The City also argues that the law of this Circuit requires some evidence of medical attention to support a claim of emotional distress, citing Carrero v. New York City Housing Authority, 890 F.2d 569 (2d Cir.1989). Carrero confirms that a prescription for medicine or a visit to a doctor can lend support to a claim for emotional distress; however, such evidence is neither required nor necessarily probative, though at some level of claimed distress the absence of medical attention may be suggestive. Here, there was no reason to expect that medicines or counseling could dispel the trauma of losing, among other things, one's professional standing in the community, one's home and one's income.
 
 CONCLUSION
 
 36
 The district court improperly shifted the burden of proof as to causation. We nonetheless affirm the lower court's award because we find that Miner was entitled to a judgment as a matter of law on the issue of causation and because the defendants have failed successfully to challenge the award in any other respect. Having prevailed in this Court, Miner is entitled to the costs of appeal.
 
 
 
 *
 Honorable Whitman Knapp, Senior United States District Judge for the Southern District of New York, sitting by designation