370 F.3d 322
 Stephen PATTERSON, Plaintiff-Appellee,
v.
CITY OF UTICA, Defendant-Appellant,
Timothy Julian, Individually and as Mayor of the City of Utica, John Doe, a fictitious name intended to indicate individuals unknown at this time, Defendants.
 No. 03-7285.
 No. 03-7435.
 United States Court of Appeals, Second Circuit.
 Argued November 7, 2003.
 Decided June 2, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Charles N. Brown, First Assistant Corporation Counsel, Utica, NY (John W. Dillon, Corporation Counsel, Utica, NY, of counsel), for Defendant-Appellant City of Utica.
 Leon R. Koziol, Law Offices of Leon R. Koziol, Utica, NY, for Plaintiff-Appellee Stephen Patterson.
 Before: CARDAMONE, SOTOMAYOR, and KATZMANN, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 Plaintiff Stephen Patterson brought suit against defendants City of Utica, and its Mayor, Timothy Julian, in his individual and official capacities (collectively defendants), in the United States District Court for the Northern District of New York (Hurd, J.) pursuant to 42 U.S.C. § 1983 (2000) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (2000). Plaintiff alleged that defendants discriminated against him based on his race, retaliated against him for exercising his First Amendment rights, and deprived him of a liberty interest without due process by making stigmatizing statements about him when dismissing him from city employment. Patterson sought damages of $1 million for each cause of action, punitive damages, attorney's fees and costs, and also reinstatement. A five-day jury trial on these allegations was held in December 2002.
 
 
 2
 The jury found the City, acting through its former Mayor, Edward A. Hanna, was liable for violating plaintiff's procedural due process rights, and awarded plaintiff $333,820.32 in damages and attorney's fees and costs. The jury also found that although Mayor Julian had terminated plaintiff from city employment and had made stigmatizing statements depriving plaintiff of a liberty interest protected by the Due Process Clause, neither he nor the City was liable for any damages for these acts because plaintiff had been given a name-clearing hearing after the stigmatizing statements were made. The jury returned a verdict for the defendants on plaintiff's race discrimination and First Amendment retaliation claims.
 
 
 3
 After the verdict was rendered, the parties each moved under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law. The district court on March 14, 2003 denied both motions in a bench decision and issued a judgment that reflected the jury's verdict. The City appeals, contending the district court erred when it entered judgment for the plaintiff on his due process claims arising from Mayor Hanna's actions, because there was not enough evidence to support the verdict. Plaintiff cross-appeals, arguing that the jury's verdict for the City on his due process claims arising from Mayor Hanna's actions cannot be sustained because the post-termination process he was provided was deficient as a matter of law. Plaintiff further appeals the jury's verdicts in favor of the City on his racial discrimination and First Amendment retaliation claims.
 
 
 4
 The circumstances leading to this litigation began when defendant City's former Mayor Edward A. Hanna hired plaintiff Patterson in 1997 as Commissioner of the City's Department of Public Works, and not long afterwards allegedly fired him. Mayor Hanna repeated this pattern of hiring and dismissing Patterson twice more, with the third and final dismissal occurring in the spring of 2000. In July 2000 — and for reasons unrelated to this litigation — Hanna resigned as Mayor of the City.
 
 
 5
 Mayor Hanna was succeeded by Utica's current Mayor, defendant Timothy Julian, who within a matter of days dismissed Patterson and accompanied that action by making stigmatizing comments about him. These hirings and firings so traumatized plaintiff that he had to seek medical help. Plaintiff eventually sued the City and Mayor Julian claiming that these events violated his constitutional rights and that his good name and reputation had been damaged.
 
 
 6
 The suit was brought under the still-evolving legal theory of stigma-plus. This theory is limited by the well-established doctrine that a state defamation action for slander by a government official, alone, cannot be converted into a federal action for loss of liberty under the Due Process Clause of the Fourteenth Amendment. Instead, to state a stigma-plus claim under the Constitution, additional circumstances must be shown. Thus, for example, the theory does not come into play unless a government employee is slandered in the course of having his employment terminated and, even then, additional requirements must be met to succeed on the claim. In this case, the proof necessary to establish the stigma-plus requirements, with respect to the actions taken by former Mayor Hanna, was insufficient. Accordingly, the jury's verdict for the plaintiff based on those actions must be reversed.
 
 
 7
 This does not end our inquiry, however, because it is clear that Mayor Julian's actions did satisfy the stigma-plus requirements. The remedy for a stigma-plus violation of a government employee's constitutional due process rights is a name-clearing hearing where the employee is given the opportunity to clear his name. Although the jury found that plaintiff had been given such hearing following his termination by Mayor Julian, the hearing was inadequate as a matter of law. It is, of course, a basic tenet of due process that a person be given notice of and an opportunity to be heard at his name-clearing hearing. Those due process guarantees were not extended to plaintiff. In consequence, plaintiff is entitled to a new trial limited solely to the issue of damages incurred by plaintiff due to the City's failure to provide him with an adequate name-clearing hearing.
 
 BACKGROUND
 A. Plaintiff's Employment with the City
 
 8
 Plaintiff Patterson, an African-American, was appointed as Codes Commissioner of the City of Utica in 1996 by then-Mayor Hanna and promoted a year later to the position of Commissioner of the Department of Public Works (DPW). Prior to the appointment as Commissioner, plaintiff had held various private sector jobs in the City but none of real authority, or that suggested that he had skills particularly suited to the posts of Codes Commissioner or Commissioner of Public Works. According to the City Charter, department heads, including the Commissioner of the DPW, are appointed solely by the mayor. Such appointees generally serve a two-year term, but may be discharged by the mayor for any reason or no reason at all during their tenure.
 
 
 9
 Beginning in 1997 plaintiff was hired, fired, and rehired three times by Mayor Hanna, whose treatment of Patterson was, to say the least, erratic. The three Hanna dismissals, which will be detailed in our Discussion, occurred in April 1998, August 1999, and March 2000. Plaintiff's final termination was undertaken by Mayor Julian in July 2000, and it too will be detailed later.
 
 B. Post-Termination Activities
 
 10
 Following his final dismissal by Mayor Julian plaintiff did not try to find a new job because he thought he would be rehired. Two months later he confirmed with Julian's office that this would not happen. Plaintiff became depressed and unsuccessfully applied for a variety of jobs for which he felt qualified. In October 2001 he finally found work in Glens Falls, New York, 115 miles from Utica, working in a Finch-Pruyn paper mill where he was employed until September 17, 2002.
 
 
 11
 In August 2002, Patterson began to visit Dr. Julia Grant, a psychiatric counselor whom he had first consulted after his August 1999 firing. She determined that the stress of his commute, the long working hours, and his depression (which was caused by his negative experiences with the City) were causing memory loss and a dangerous physical strain on plaintiff. These problems exacerbated a back injury plaintiff had suffered in 1994 and a head injury with resulting memory problems he had suffered in 1997. Dr. Grant submitted an affidavit to his employer Finch-Pruyn in conjunction with plaintiff's application for a disability accommodation. Plaintiff testified that during a meeting to discuss this application the subject of his employment with the City of Utica and the resulting distress was raised. Finch-Pruyn also reviewed the medical report submitted by Dr. Grant mentioning his problems with the City. Plaintiff was fired three days after this meeting, and testified he is now forced to work in jobs requiring manual labor, which is very difficult due to his physical disabilities.
 
 C. Trial
 
 12
 Stephen Patterson commenced the instant action against the City and Mayor Julian in November 2001. Plaintiff testified at the trial, as did Mayor Julian and numerous other witnesses, although former Mayor Hanna did not. The jury found for defendants with respect to the First Amendment and racial discrimination claims. The jury also found that defendant City of Utica "made false, stigmatizing statements causing a loss to plaintiff Stephen Patterson's reputation and foreclosing employment opportunities, and that such statements were made close in time to his termination(s) in April 1998, August 1999, March 2000, or July 2000." This verdict reflected actions taken by both Mayor Hanna and Mayor Julian.
 
 
 13
 With respect to the actions of Mayor Hanna, the jury found that the City failed to provide plaintiff with an opportunity for a name-clearing hearing, and thereby violated his right to due process, causing him damages. With respect to the actions of Mayor Julian, however, the jury found that the City provided plaintiff with an opportunity for a name-clearing hearing and that, therefore, neither Mayor Julian nor the City was liable in damages for violating plaintiff's due process rights.
 
 
 14
 We proceed to analyze plaintiff's claims for violation of his due process rights since, after review of the record, we agree with the district court that there were no grounds upon which to grant plaintiff's motion to reinstate his First Amendment and racial discrimination claims.
 
 DISCUSSION
 I The Fourteenth Amendment and Stigma Plus
 
 15
 Section 1983 of Title 42 provides that "every person who, under color of [state law] subjects ... any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest. U.S. Const. amend XIV, § 1; Bd. of Regents v. Roth, 408 U.S. 564, 569-70 & n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
 
 
 16
 A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983. See Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Morris v. Lindau, 196 F.3d 102, 114 (2d Cir.1999). Instead, when dealing with loss of reputation alone, a state law defamation action for damages is the appropriate means of vindicating that loss. Davis, 424 U.S. at 701-02, 96 S.Ct. 1155; Morris, 196 F.3d at 114.
 
 
 17
 Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment. Roth, 408 U.S. at 572-73, 92 S.Ct. 2701; Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir.1994). For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment. Roth, 408 U.S. at 573, 92 S.Ct. 2701; Morris, 196 F.3d at 114. This type of claim is commonly referred to as a "stigma-plus" claim. Id.
 
 
 18
 In order to fulfill the requirements of a stigma-plus claim arising from the termination from government employment, a plaintiff must first show that the government made stigmatizing statements about him — statements that call into question plaintiff's "good name, reputation, honor, or integrity." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir.1980). Statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" may also fulfill this requirement. Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630-31 (2d Cir.1996).[1] A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false. Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 43 (2d Cir.1987). Second, a plaintiff must prove these stigmatizing statements were made public. Abramson v. Pataki, 278 F.3d 93, 101-02 (2d Cir.2002). And third, plaintiff must show the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment. Martz v. Inc. Vill. of Valley Stream, 22 F.3d 26, 32 (2d Cir.1994) (five months later for publication of defamatory statements is too long). If a plaintiff successfully proves his stigma-plus claim, due process requires that as a remedy he be given a post-deprivation opportunity to clear his name. Roth, 408 U.S. at 573 & n. 12, 92 S.Ct. 2701; Donato, 96 F.3d at 633.
 
 II The Verdict
 
 19
 Having laid out the basic requirements for a stigma-plus claim, we now turn to an analysis of the jury's verdict in favor of plaintiff based on the actions of Mayors Hanna and Julian. As an initial matter, since the City concedes that its mayor is a high-ranking official with final policymaking authority in the municipal employment area at issue in this case, the City can, pursuant to § 1983, be held liable for the actions of its mayor. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); City of St. Louis v. Praprotnik, 485 U.S. 112, 124-27, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).
 
 
 20
 Appellate review of the grant or denial of a Rule 50 motion for judgment as a matter of law after the verdict requires us to determine whether, viewing the evidence in a light most favorable to the nonmoving party, the evidence supporting the verdict is so lacking that the jury verdict could only have been the result of surmise and conjecture. See Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir.1993). The following analysis relates the facts relevant to plaintiff's procedural due process claim in the light most favorable to plaintiff with respect to the actions of Mayor Hanna, and in the light most favorable to defendant City with respect to the process afforded plaintiff by Mayor Julian.
 
 A. Actions by Mayor Hanna
 
 21
 1. April 1998 Incident. Plaintiff failed to produce any evidence that the City, through the actions of Mayor Hanna, deprived him of a liberty interest in connection with his April 1998 termination. No stigmatizing statements were made public by Hanna in the course of this termination. The record reveals that Hanna accused plaintiff of bringing an extra-marital affair involving city employees to Hanna's attention for selfish purposes. According to plaintiff, Mayor Hanna's statement about him was made directly to him in private. Thus, this statement, even if it could be categorized as stigmatizing, does not satisfy the required publication component. See Bishop v. Wood, 426 U.S. 341, 348-49, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).
 
 
 22
 In addition, plaintiff's testimony that he learned about his termination from the newspaper is not sufficient to satisfy the stigma-plus requirements because he failed to allege there were any defamatory or stigmatizing statements contained in the news article and, in addition, failed to produce the article as proof of any such accusation at trial. Thus, with respect to plaintiff's first termination, it would have been sheer surmise or conjecture on the part of the jury to conclude that any public statements, let alone stigmatizing ones, were made in the course of plaintiff's termination.
 
 
 23
 2. August 1999 Incident. Four months later, in August 1998, Hanna reappointed Patterson to the position of Codes Commissioner and in November 1998, Hanna again gave plaintiff the additional responsibility of overseeing the DPW, although plaintiff was not officially reappointed Commissioner of the DPW until early 1999. Mayor Hanna then began to accuse Patterson of being a drug dealer. He also accused plaintiff of taking kickbacks and stealing from the City. These disparaging remarks culminated in August 1999. At that time Hanna requested plaintiff meet him on a city street called Pond Lane. When plaintiff arrived, Mayor Hanna began yelling, cursing and spitting at Patterson, and accused him of being a "no good drug dealer." Hanna also told plaintiff that he was fired. This incident took place in front of a number of Pond Lane residents — including a city court judge — who had come out of their homes to investigate what was going on. None of those witnesses testified at the trial. This alleged termination of plaintiff's city employment lasted for only two weeks, at which time Mayor Hanna asked plaintiff to return to his job as Commissioner of the DPW. Patterson agreed to return.
 
 
 24
 It is clear that public, stigmatizing statements that called into question plaintiff's "good name, reputation, honor, or integrity" were made by Hanna in connection with this 1999 firing. Quinn, 613 F.2d at 446. The evidence, proving that Hanna publicly alleged that plaintiff was involved in criminal activity, was sufficient evidence upon which the jury could base a conclusion that plaintiff was publicly stigmatized.
 
 
 25
 Nevertheless, plaintiff's two-week hiatus from government employment ought not, on that account, to be considered a termination for purposes of the stigma-plus requirements. First, plaintiff produced no evidence that he was actually taken off of the city payroll during the two-week period for which he was dismissed. Second, even if plaintiff had shown such evidence, since he began working for the City again two weeks later, his time off the job is more analogous to a suspension than a termination of employment. It cannot, as a matter of law, be viewed as a significant alteration of plaintiff's employment status when, in fact, he was quickly hired back in the same position from which he was supposedly fired. See Davis, 424 U.S. at 710-11, 96 S.Ct. 1155 (requiring significant alteration of status in order to show plus factor); Dobosz v. Walsh, 892 F.2d 1135, 1140 (2d Cir.1989) (holding five-month suspension of police officer not a sufficient plus factor to give rise to a protected liberty interest when he was later reinstated with back pay). Hence, it was sheer surmise and conjecture for the jury to conclude that plaintiff proved the elements of his stigma-plus claim with respect to the August 1999 incident.
 
 
 26
 3. March 2000 Incident. Plaintiff served as Commissioner of the DPW without incident throughout the remainder of 1999 and until early 2000. In early 2000 the Mayor, due to his rancorous relationship with the press, requested that city employees refrain from speaking individually with the press, and directed that all communications be conducted centrally through his office. In March 2000 the Mayor asked plaintiff to sign a memo — to be distributed to the press in plaintiff's name — alleging that as many as 25 percent of DPW employees were using illegal drugs. When Patterson refused to sign, Hanna convinced the deputy commissioner of the DPW to sign it instead. The memo was distributed to the media and reported in the local press. The Mayor fired plaintiff because he refused to sign the memo. He then requested plaintiff not make any statements to the press about his termination or the allegations in the memo. When the media contacted plaintiff to question him about his firing and the allegations in the memo, Patterson refused comment. A few hours later, Hanna came to plaintiff's house and took him out to lunch, thanking him for not commenting to the press. Plaintiff returned to his job after lunch.
 
 
 27
 For the same reasons stated earlier with respect to the August 1999 incident, the March 2000 incident cannot, as a matter of law, satisfy the stigma-plus requirements. The plaintiff was fired for an even shorter period of time in connection with this incident than in connection with the August 1999 incident. It was conjectural for the jury to conclude that the plaintiff had been terminated for stigma-plus purposes under these circumstances.
 
 
 28
 Because the jury's verdict was based on surmise and conjecture, the district court should have granted defendants' motion for judgment as a matter of law after the verdict with respect to the plaintiff's claims arising out of the actions of Mayor Hanna. The plaintiff's damage award was based upon the jury's verdict against the City based on Hanna's conduct, a fact that is clear from the jury's conclusion that Mayor Julian afforded plaintiff a name-clearing hearing for his deprivation of plaintiff's liberty interest. The judgment against the City must therefore be reversed, including the damage award. The case should be remanded to the district court for entry of judgment in favor of defendant City with respect to plaintiff's claims pertaining to the actions of Mayor Hanna.
 
 B. Actions by Mayor Julian
 
 29
 1. July 2000 Termination. On July 3, 2000, Mayor Hanna unexpectedly resigned, and Timothy Julian, as president of the Common Council, succeeded him as Mayor of the defendant City. Because the City was hosting the annual Utica Boilermaker — an internationally recognized road race drawing 10,000 runners — six days after Julian took office, his main concern was that the streets of Utica be clean, a responsibility falling on the DPW. Mayor Julian testified that due to the plaintiff's poor performance in connection with the race, and poor street maintenance he had observed as a private citizen, he decided to dismiss plaintiff. Hence, he sent Patterson a memo dated July 13, 2000, advising him of his termination from city employment.
 
 
 30
 2. Statements Regarding Termination. On July 14 an article in the local newspaper reported that Mayor Julian had asked for plaintiff's resignation. This article appeared on page two of the newspaper, and quoted Mayor Julian as stating "I want to see the DPW moving in a new direction and when you see problems with the entire unit, you look to the leadership." On the same day, the newspaper ran a front page story reporting that the City's March 2000 allegations under Mayor Hanna of widespread drug use amongst the employees of the DPW had been found to be unsubstantiated. Mayor Julian was quoted as stating "I am not aware of any documentation that lends credence to the allegations [of drug use at DPW] or substantiates them." This front page article continued onto page two with the short article about plaintiff's dismissal printed in a box inside of it. The Mayor testified he had spoken to the press about both of these issues on the same day, but that he was not aware that the stories would be printed in that fashion.
 
 
 31
 Sometime after plaintiff's termination was reported, the local chapter of the NAACP contacted Julian and asked if he would meet with them and other black community leaders. Plaintiff was not invited to this meeting (first meeting), and Mayor Julian testified he did not know the meeting was going to be about plaintiff's termination. Although there is no evidence to show exactly when this meeting took place, it must have been held after July 14, 2000, the date of the newspaper article reporting plaintiff's termination, and before July 21, 2000, the date of the second meeting. Patterson's dismissal was the main topic of discussion before the approximately eight attendees, all of whom were members of Utica's African-American community. Those community leaders demanded to know why Patterson had been fired.
 
 
 32
 In addition to stating that he was unhappy with plaintiff's performance, Mayor Julian related that upon taking office, members of city government had provided him with written and oral information regarding a number of alleged incidents involving plaintiff, including a DPW vehicle being shot at, an illegal weight room in the DPW garage, a cabaret club connected with plaintiff that had an unpaid license, an outstanding city cell phone bill, and an incident where plaintiff allegedly took a payment with regard to city-owned property without having the authority to do so. Julian discussed these allegations and also distributed an affidavit he had been given containing the troubling accusation related to the receipt of an unauthorized payment. The Mayor testified at trial that he had not looked into the accuracy of the allegations made in the affidavit prior to distributing it, and there is no evidence that he offered plaintiff an opportunity to defend himself against any of these allegations before they were aired at the meeting. The distributed copy of the affidavit was collected before the end of the meeting.
 
 
 33
 Mayor Julian then held a second meeting with the same community leaders (it appears one or two of the attendees at the first meeting were not present at the second meeting) on July 21, 2000 to discuss the accusations voiced at the prior meeting. Although plaintiff was not invited to or given official notice of this meeting either, he nevertheless heard about it through word-of-mouth and chose to attend. Plaintiff testified at trial that at this meeting, Mayor Julian asked the community members to give him a reason why he should change his mind about plaintiff's firing. He also testified that the Mayor mentioned the cabaret club, cell phone bill, and weight room allegations, as well as allegations that plaintiff had struck a DPW employee; but that not all the accusations from the first meeting were discussed. Plaintiff challenged the accusations that were raised and insisted they were all false.
 
 
 34
 After the meeting, Mayor Julian said he would consider reappointing plaintiff. Julian testified that he did not rehire plaintiff even after Patterson denied the allegations because his termination of plaintiff was based on his feeling that "the job was not being done to my satisfaction," and not on the allegations accusing plaintiff of questionable behavior. Contrary to the Mayor's recollection, a friend of plaintiff's family testified at trial, however, that sometime in July 2000 he asked Mayor Julian why he fired plaintiff. The friend said that Julian responded he had "some evidence or proof that [plaintiff] was involved with some shady characters" and that plaintiff was connected with a vehicle that had been shot at.
 
 
 35
 The jury concluded with respect to plaintiff's final termination that Mayor Julian had made public, stigmatizing statements about plaintiff in the course of his termination, but that Julian had afforded the plaintiff a name-clearing hearing, and that, thus, the City could not be held accountable for any damages plaintiff suffered as a result of Mayor Julian's actions.
 
 
 36
 3. Establishing Stigma-Plus Claim. Plaintiff presented evidence the jury may have relied on to infer that Mayor Julian, through the use of the press, was attempting to pin partial responsibility for the false allegations of drug use at the DPW on plaintiff's shoulders. There is no requirement that in order to succeed on a stigma-plus claim a plaintiff must produce an "explicit public statement by a municipal official accusing the discharged employee of `immoral or illegal' conduct." Quinn, 613 F.2d at 447. "A subtle campaign designed by city officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall." Id. We find the jury could have inferred that Mayor Julian's statements to the press constituted a subtle campaign to make Patterson the scapegoat for former Mayor Hanna's municipal misfeasance, even though we believe it highly unlikely that it did so, due to the paucity in the record of evidence of such a campaign.
 
 
 37
 Further, the record reflects that Mayor Julian made other stigmatizing statements about Patterson in the course of his termination. The evidence showed that Julian disseminated stigmatizing information at the first meeting with black community leaders held after plaintiff's termination and that he also discussed them outside of this meeting with a member of the community that inquired as to why plaintiff had been fired. These comments, because they were made in the course of plaintiff's termination, and in fact in direct response to questions about why the plaintiff was terminated, were sufficient for the jury to conclude that plaintiff had proven his stigma-plus claim. See Ulrich v. City and County of San Francisco, 308 F.3d 968, 983 (9th Cir.2002) (stating no requirement for a strict temporal link between stigmatizing statements and discharge; instead requirement is that stigmatizing statements be "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye"); cf. Martz, 22 F.3d at 32 (absence of necessary nexus found when statements were made five months later and could not have been a factor in decision not to reappoint).
 
 
 38
 Although we recognize that the statements were made after plaintiff's termination, see Gentile v. Wallen, 562 F.2d 193, 198 (2d Cir.1977), we are nonetheless confident that in this particular situation, where some of the statements were made within one week of plaintiff's termination, and were made in direct response to requests for reasons for plaintiff's termination, that the proper nexus exists to demonstrate a deprivation of plaintiff's liberty interest that is protected by the Due Process Clause. Cf. Gentile, 562 F.2d at 194, 198 (evidence showed that publication of allegations against plaintiff were made at least three months after termination, therefore did not trigger due process rights).
 
 III Sufficiency of Hearing
 A. Insufficient Under Due Process
 
 39
 Plaintiff moved for judgment as a matter of law under Fed.R.Civ.P. 50 following the verdict challenging the jury's finding that the City provided him with a name-clearing hearing after his July 2000 termination by Mayor Julian. We think the district court erred in denying plaintiff's motion. A post-deprivation name-clearing hearing may defeat a plaintiff's stigma-plus claim, so long as the hearing is adequate for due process purposes. In this case the hearing afforded plaintiff was not. As a consequence, plaintiff is entitled to damages resulting from the deprivation without due process of law of his liberty interest. See Donato, 96 F.3d at 633.
 
 B. Analysis of Law Governing Name-Clearing Hearing
 
 40
 The appropriate remedy for a stigma-plus claim premised on a plaintiff's termination from at-will government employment is a post-deprivation name-clearing hearing.[2] This hearing gives the plaintiff an opportunity to hear and answer first-hand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation. See Codd v. Velger, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (stating that unless plaintiff alleges charges against him are false, name-clearing hearing would fail to serve its purpose of clearing plaintiff's name of false charges made against him).
 
 
 41
 In July 2000 Mayor Julian made multiple allegations concerning plaintiff. Only a few of those allegations were raised at the second meeting, at which Patterson, though uninvited, was present. The Mayor did not bring up the criminal allegations that were the subject of the affidavit he had passed out at the first meeting, nor did he discuss the subtle campaign to pin responsibility on plaintiff for former Mayor Hanna's mistaken allegations of drug use at the DPW.
 
 
 42
 A name-clearing hearing must conform to the requirements of the Due Process Clause. The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at "a meaningful time and in a meaningful manner." Goldberg, 397 U.S. at 267, 90 S.Ct. 1011. The standards by which the constitutionality of such procedures should be measured are well-established. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Valmonte, 18 F.3d at 1003. In Mathews the Supreme Court stated that a three-factor test applies when evaluating the sufficiency of these procedures. A court must examine: (1) the nature of the interest affected by the official action; (2) the government's interest; and (3) the risk of error and the effect, if any, of additional safeguards. Mathews, 424 U.S. at 335, 96 S.Ct. 893; Valmonte, 18 F.3d at 1003. A court must balance these factors to determine what type of procedures would assure fairness in a particular case. Mathews, 424 U.S. at 347-49, 96 S.Ct. 893; Valmonte, 18 F.3d at 1003.
 
 
 43
 To analyze the sufficiency of the procedures afforded plaintiff, we begin with the nature of the plaintiff's interest that was effected by official action. A stigma-plus claim, as discussed earlier, requires that a plaintiff's interest in his reputation be implicated in connection with his termination from government employment. This requirement, in conjunction with the requirement for a name-clearing hearing, demonstrates that it is the plaintiff's reputational interest, and how that interest can effect his standing in the community and his future job prospects, that is at issue here. See Valmonte, 18 F.3d at 1003; Donato, 96 F.3d at 632.
 
 
 44
 We next turn to the government's interest. The state interest at issue in a stigma-plus claim has been defined as the interest of an executive officer to make and explain important personnel decisions. Baden v. Koch, 799 F.2d 825, 831 (2d Cir.1986) ("An executive who fails to act when the facts demand action will often be taken to task by the legislature, the media and the public for the continued shortcomings of his subordinates."). And, looking at the third factor, we examine the risk of erroneous deprivation of plaintiff's rights that the government creates through the process it offers. The risk inherent in a stigma-plus claim is the risk that the false charges against the plaintiff will go unrefuted and that his name will remain stigmatized. Id. at 832.
 
 
 45
 There are only a few cases in this Circuit addressing what kind of process the Mathews balancing test requires with respect to a stigma-plus name-clearing hearing. It is plain, however, that the high risk of error produced by the scanty procedural protections afforded plaintiff, and the low burden that a proper hearing would have placed upon the city government are sufficient for us to conclude that the requirements of the Due Process Clause were not met here. The grounds we have considered and that we use as a guide to balance Mathews' factors in the stigma-plus context are varied: for example, whether plaintiff was terminated as opposed to demoted effects the strength of his private interest, with termination obviously increasing its strength, see Baden, 799 F.2d at 830-31, and whether stigmatizing statements would prevent the plaintiff from obtaining employment in his profession in the future — this ground makes it more critical for the government to avoid risking an erroneous deprivation, see Valmonte, 18 F.3d at 1003-05.
 
 C. Facts Regarding Plaintiff's Hearing
 
 46
 To begin with, Patterson was not given notice of the second meeting at which the allegations against him were to be discussed. At that meeting, which plaintiff did attend, the Mayor did not present the broad battery of the allegations against him. Hence, plaintiff had no opportunity to defend himself fully against all of the allegations made. Further, there was no effort on the part of Mayor Julian to publicize the defenses that plaintiff was given an opportunity to offer. The fact that the plaintiff was able to address some of the allegations in front of some of the same community leaders who participated in the first meeting is not sufficient to show that plaintiff's name was sufficiently cleared because not all of the attendees of the first meeting were at the second meeting. Moreover, Mayor Julian made no public statement addressing the stigmatizing impressions printed in the local newspaper so that the public would be aware that the plaintiff was not responsible for the City's earlier mistake with respect to the allegations of employees at the DPW being drug users.
 
 
 47
 The facts of this case make it evident that the so-called hearing that took place on July 21, 2000 was insufficient to allow plaintiff to refute the charges against him and clear his name. There was a substantial risk that the stigma against plaintiff would remain after such hearing. Requiring the City to address such risk by offering plaintiff the opportunity to publicly refute the charges made against him or publicizing his refutations itself, does not place an undue burden upon the government's interest in terminating department heads who either are not performing to expected standards or are behaving in an unacceptable fashion.
 
 
 48
 Thus, we hold as a matter of law the July 21, 2000 hearing was insufficient to satisfy the requirements of the Due Process Clause. As a consequence, for the jury to conclude that this hearing could have been a sufficient remedy for the charges Mayor Julian made against plaintiff could only have been the result of surmise and conjecture. The dismissal of plaintiff's claim against the City and Mayor Julian must therefore be reversed and the case remanded for a new trial on damages.
 
 IV Damages
 
 49
 Since the process afforded the plaintiff was not adequate to remedy the deprivation of his liberty interest, he is entitled to nominal damages based on the deprivation itself, see Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), and may, in addition, be entitled to collect compensatory damages, if he can prove that he suffered actual injury as a result of the denial of due process. Id. at 264, 98 S.Ct. 1042.
 
 
 50
 In a prior stigma-plus case, in which no name-clearing hearing was provided, we remanded to the district court, ordering that it arrange a name- clearing hearing for the plaintiff to determine if the charges against her were true or false and to award damages, or not, accordingly. Donato, 96 F.3d at 633. We decline to do that in this case because four years have passed since the due process violation took place. It is unlikely that a proper name-clearing hearing would, at the present time, reverse any ill effects suffered by plaintiff from the inadequacy of the former hearing. Cf. Ersek v. Township of Springfield, 102 F.3d 79, 84 n. 6 (3d Cir.1996) ("[A] name-clearing hearing might be insufficient to cure all the harm caused by stigmatizing government comments. For instance, injury to a plaintiff's reputation might be irreversible.").
 
 
 51
 We have not had occasion to rule directly on the issue of what kind of damages a stigma-plus plaintiff may recover if a defendant fails to provide him with a sufficient name-clearing hearing and the seminal cases of Davis and Roth simply state what circumstances give rise to the right to the name-clearing hearing, and not what damages are proper if that right is not fully accorded plaintiff. Upon review of our decisions in similar cases we find a well-established general principle upon which to rely in determining what damages are appropriate under these circumstances. We have held that the plaintiff has the "burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed." Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir.1993); see McCann v. Coughlin, 698 F.2d 112, 126 (2d Cir.1983).
 
 
 52
 Relying upon this principle, it is evident that in order to award plaintiff compensatory damages, the jury must determine that the injuries plaintiff claims he suffered as a result of the deprivation of his liberty interest would not have occurred if Mayor Julian had provided plaintiff with a sufficient name-clearing hearing. Accordingly, upon remand, the trial court should explain two things to the jury: first, it may only award damages for injuries suffered by plaintiff arising from the City's failure to give him the opportunity to clear his name after Mayor Julian made stigmatizing statements in connection with his firing in July 2000; second, the jury will need to decide if the damages complained of by plaintiff — lost wages, reputational damage, emotional distress and the resulting physical ramifications of that distress — were caused by his failure to receive an adequate name-clearing hearing. If the jury determines that the plaintiff would not have been reinstated or would have been terminated from subsequent employment regardless of whether or not he received a name-clearing hearing, it cannot award him lost wages. See Miner, 999 F.2d at 660. As to the reputational damage and physical and emotional distress of which plaintiff complained, if the jury determines that such damages were the result of the failure of the City to provide plaintiff a full and effective name-clearing hearing, they may award damages accordingly. Again, plaintiff may only recover for damages resulting from the actions of Mayor Julian, and not from those of Mayor Hanna.
 
 CONCLUSION
 
 53
 In sum, we hold that the district court erred when it denied the City's Rule 50 motion for judgment as a matter of law notwithstanding the jury's verdict in favor of plaintiff. The jury's verdict, based on the actions of former Mayor Hanna, cannot stand because there was not enough evidence to support such a verdict. As a result, we reverse this part of the judgment, including the damage award, and remand to the district court for entry of judgment in favor of the City with respect to this part of plaintiff's claim.
 
 
 54
 Next, we hold that the district court erred when it denied plaintiff's Rule 50 motion for judgment as a matter of law with respect to the jury's verdict in favor of Mayor Julian and the City because plaintiff was never afforded a sufficient name-clearing hearing. As a result, we reverse this part of the judgment in favor of defendants and remand to the district court for a new trial solely on the issue of plaintiff's damages.
 
 
 55
 Finally, we hold the district court correctly denied plaintiff's motion for judgment as a matter of law with respect to plaintiff's First Amendment retaliation, and racial discrimination claims, and accordingly, affirm this portion of the judgment.
 
 
 56
 Affirmed, in part, reversed, in part, and remanded.
 
 
 
 Notes:
 
 
 [1]
 The verdict form submitted to the jury required that they find that the statements made about plaintiff both caused a loss to plaintiff's reputation and foreclosed future employment opportunities. In a situation where statements that obviously implicate a plaintiff's good name or honor, such as criminal allegations, are at issue, it is not necessary for a plaintiff to prove that future employment opportunities were foreclosed in order for his claim to be successful. This is an additional requirement only in cases where a plaintiff is claiming that his professional reputation and competence have been impugnedSee Donato, 96 F.3d at 630-31. The jury unnecessarily found that with respect to the actions of both Mayor Hanna and Mayor Julian, future employment opportunities had been foreclosed. This finding is relevant only to damages in a case like this one.
 
 
 [2]
 We do not read our recent decision inDiBlasio v. Novello, 344 F.3d 292 (2d Cir.2003), as suggesting otherwise. Rather, DiBlasio is limited to a situation where the district court has dismissed a stigma-plus claim pursuant to Federal Rule of Civil Procedure 12(b)(6).