Claude L. HUNTLEY, Jr.,
Plaintiff-Appellant,

v.

COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT NO. 14, et al., Defendants-Appellees.

No. 53, Docket 75–7190.

United States Court of Appeals,
Second Circuit.

Argued Sept. 22, 1975.

Decided May 12, 1976.

James I. Meyerson, New York City (Nathaniel R. Jones, Thomas Hoffman, N.A.A.C.P., New York City, on the brief), for plaintiff-appellant.

Mark D. Lefkowitz, Asst. Corp. Counsel, New York City (W. Bernard Richland, Corp. Counsel, L. Kevin Sheridan, Leonard Koerner and Deborah Rothman, Asst. Corp. Counsel, New York City, on the brief), for defendants-appellees.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered February 19, 1975 after a three day bench trial in the Eastern District of New York, Jack B. Weinstein, *District Judge,* which dismissed the complaint of Claude L. Huntley, Jr., an acting public school principal, in a civil rights action brought against a community school board, its members and the district superintendent to challenge the termination of the principal's employment, the question presented is the correctness of the district court's rejection of Huntley's claims that his termination violated his rights under the equal protection and due process clauses of the Fourteenth Amendment.

For the reasons below, we affirm the district court's rejection of Huntley's equal protection claim since there was not a scintilla of evidence that he was terminated for racial reasons; but we reverse the district court's rejection of his due process claim which was based on the failure to accord him a hearing prior to his termination and, as to this claim, we remand for a determination of what damages, if any, Huntley can prove that he sustained.

## I. FACTS

■ We shall summarize those facts necessary to an understanding of our rulings on the questions presented.[1]

### (A) *Huntley's Appointment*

Huntley, a black, became acting principal of Intermediate School 33 (I.S. 33) in Brooklyn on September 9, 1970. He served until he was terminated on May 25, 1973. The school is located in New York City School District 14. The position of acting principal carried neither tenure nor any contractual right to continued employment under New York law. I.S. 33 is approximately 99 per cent black and Hispanic. Approximately 90 per cent of the children who attend schools in District 14 are likewise black or Hispanic. The faculty at I.S. 33 is overwhelmingly white. Huntley was the first black principal in any of the schools within what is now District 14.

Both sides agree that Huntley was appointed pursuant to a so-called affirmative action program. He had significant credentials for the position. He had helped organize a public school for socially maladjusted boys in the same community. He had

---

1. Our summary of the facts is based on the district court's findings of fact which we accept not only as not clearly erroneous, Fed.R.Civ.P. 52(a), but as a balanced evaluation of the evidence adduced at the three day hearing, consisting of the testimony of seventeen witnesses and fifty-three exhibits.

The district court's findings of fact provide the underpinning for its conclusions of law. We agree with one, as to the equal protection claim; but we disagree with the other, as to the due process claim.

served in the same community as a teacher and as acting assistant principal for four and a half years before becoming acting principal of I.S. 33. By the time of the trial Huntley had completed the requirements for an M.A. degree from Columbia University Teachers College and had earned additional credits from that College and from Brooklyn College in Administration and Supervision. Although not certified as an intermediate school principal (such certification not being necessary for his I.S. 33 position), he was certified as an elementary or secondary school principal.

(B) *Events Preceding Huntley's Termination*

Despite Huntley's background and experience, shortly after he became acting principal, I.S. 33 became plagued with fires, hallway incidents, teacher complaints and other problems. During his three years as acting principal the school had 39 reported fires. The school had no reported fires the year before Huntley took over and only one the year after he was terminated. During his time as acting principal I.S. 33 also had an unusually high number of hallway incidents—caused by students and by outsiders—compared to the number of such incidents before and after Huntley's service. The number of parents who requested transfer of their children from I.S. 33 rose from 5 during Huntley's first year, to 28 during his second, to 132 during his final year. Thereafter the number of requested transfers dropped off significantly. During his service as acting principal a large number of teachers' grievances were filed against Huntley, most of which were upheld. On March 6, 1973, Huntley sent a letter to the parents of students apprising them of the "EMERGENCY SITUATION occurring in our school." The letter cited the large number of fires, false alarms, fights and disruptions, and asked for parent volunteers. The letter concluded with the

warning, "You must act now because tomorrow may be too late." [2]

According to the witnesses who testified on behalf of Huntley at trial—including teachers, parents and a member of the school board—Huntley had developed a close rapport with students and parents, and had won community-wide approval. This testimony was sharply disputed by defendants' witnesses. Nevertheless, there was enough support for Huntley in the community so that when he was terminated the school was boycotted and closed down for three days, and its graduation exercises were cancelled.

The evidence also disclosed that sharp differences developed between Huntley and the Superintendent of School District 14, William A. Rogers, about a year after Huntley became acting principal. By March 1973, they were exchanging heated letters over the large number of fires, teacher grievances and disruptions. The letters also dealt with Huntley's charges that the teachers had formed a "cabal TO GET HUNTLEY" and that they wanted to maintain "an institutionalization of racism" at the school. Huntley and Rogers also disagreed about educational philosophy. For example, they clashed over a social studies program in which leaders of a community gang were invited to participate on an urban affairs panel together with members of the police department.

In his testimony at trial, Huntley attributed the large number of fires and disruptive incidents to insufficient staffing. Budget records, however, disclosed that I.S. 33 had been assigned twice as many school aid and school guard man-hours as any other intermediate or junior high school in the district. The school also had between six and eight assistant principals during Huntley's time as acting principal. This was as many as any other intermediate school in the district. Moreover, the number of fires and other incidents declined sharply under

---

2. The emergency situation reflected in this letter is in sharp contrast with that indicated fourteen months earlier in his letter of January 11, 1972 to the Community Superintendent of

District 14 in which Huntley asked for a salary increase and stated, "I.S. 33 is in better shape now than it has been throughout the history of the school."

Huntley's successor, even though the number of school aid hours assigned to the school was cut nearly in half.

Huntley also testified that the number of teacher complaints was attributable to racism. This was undermined by other evidence that Huntley's successor, also a black, was getting along well with the teachers and that only one grievance had been filed against him. Moreover, in a letter to the Chancellor of the New York City Public School System in 1972, Huntley asked for a salary increase and charged that he was being discriminated against in terms of pay because of his race. Previously he had been informed in a letter from the district superintendent that under the Board of Education regulations a higher salary could not be paid to him. When asked about this at trial Huntley admitted that he had looked at the regulations before making the charges of racial discrimination. Then he went on to explain, "I was trying to get more money and I tried, but I didn't get it. . . . I checked the regulation, but I felt that perhaps they could take my case under consideration . . . and maybe change the [regulation]."

(C) *Huntley's Termination*

On the evening of May 25, 1973 Huntley appeared before an executive session of the Community School Board to discuss his plans for reorganizing I.S. 33. Superintendent Rogers was present. Frictions between Huntley and Rogers by this time were at a peak. Huntley had been given no indication that the Board might discuss his performance as acting principal. Essentially the only discussion he had with the Board concerned his school reorganization plans. After Huntley returned home that evening, Leroy Fredericks, one of the three minority members of the nine-member Board, called Huntley and gave him the surprising news that the Board had voted to terminate him.[3]

A Parents Association then filed a grievance on Huntley's behalf with the Chancellor of the New York City Public School System. The grievance asserted that the Board's vote was invalid because it was taken at an executive session rather than at a public meeting. Huntley was not entitled to a hearing under New York law because he did not have tenure. The Chancellor nevertheless directed that the Board's May 25 vote be "ratified" at a public meeting. A special public meeting accordingly was called for June 5, 1973.

In the meantime Superintendent Rogers had sent to the Board members a letter dated June 1, 1973 setting forth formal charges against Huntley and recommending his termination.[4] Although Huntley had

3. Fredericks had voted against Huntley's termination. The other two minority members of the Board were not present at the meeting.

4. Superintendent Rogers' letter of June 1, 1973 set forth the charges against Huntley as follows:

". . . Mr. Huntley has, over a protracted period of time, failed to demonstrate that quality of professional leadership necessary to effectively deal with the educational program at I.S. 33. Consequently, the school situation has rapidly deteriorated. Instances of his insufficiencies are as follows:

Mr. Huntley has not been able to implement an effective educational program. He has demonstrated an inability to provide the necessary leadership in working with a staff of professional teachers and supervisors. He has not provided for the basic safety of the children and staff of the school. He has failed to maintain a reasonably functional educational plant that is conducive to an effective learning environment.

Mr. Huntley has not effectively resolved problems that occurred in the administration and supervision of the school. He has failed to anticipate problems and implement action that would provide a reasonable instructional atmosphere. He has not communicated as educational and administrative leader in a manner to provide a viable educational program.

Mr. Huntley has been ineffective in implementing recommendations and suggestions to improve the educational climate of the school. He has failed to utilize the additional resources that were provided to create an effective school program.

The leadership of Mr. Huntley at I.S. 33 has created a climate of confusion and discontent in the school. The educational climate of the school is now one of general disorder thus depriving many children of a proper and effective learning situation."

not been given any written statement of the charges against him—prior to either the May 25 meeting or the June 5 meeting—Fredericks showed him his copy of Rogers' letter of June 1.

At the June 5 public meeting the secretary of the Board read Rogers' letter to the 300 or so persons present. Huntley was not given an opportunity to respond to the public reading of the charges against him nor to challenge them by calling witnesses. The purpose of the meeting was to "ratify" the Board's earlier vote, not to give Huntley a hearing.

The meeting turned into a bedlam. At the outset, the secretary of the Board announced that people in the audience would be allowed to speak for three minutes each—for a total of thirty minutes. When it was announced that the thirty minutes had expired and that no more speakers would be heard, Huntley's supporters, who comprised the majority of the audience, turned the meeting into chaos. The police rushed in to break it up. The Board took a hurried poll. It resulted in a 7–2 vote to terminate Huntley. The two votes against Huntley's termination were cast by Fredericks and one of the other minority members of the Board. The vote was reaffirmed in a subsequent poll a short time later.

After the June 5 meeting parents and students staged a boycott of I.S. 33 with the results mentioned above—closing the school for several days and forcing cancellation of the graduation exercises. The Parents Association filed another grievance on Huntley's behalf. This was rejected by the Chancellor after a hearing.

Huntley commenced the instant action in the district court on November 30, 1973, seeking the relief stated above on the ground that he had been terminated as acting school principal because of racial discrimination and without a hearing in violation of his rights under the equal protection and due process clauses of the Fourteenth Amendment.[5] After a three day trial which began February 6, 1975, Judge Weinstein filed a comprehensive opinion on February 19, 1975 ordering that the complaint be dismissed. From the judgment entered the same day, this appeal was taken.

## II. EQUAL PROTECTION CLAIM

We turn directly to Huntley's contention that the district court erred in rejecting his equal protection claim based on his assertion that he was terminated as acting school principal for racial reasons.

The predicate of his equal protection claim is that a history of racial discrimination in the New York City schools imposed upon defendants the burden of disproving a discriminatory motive for his termination.

■ The Supreme Court made it clear in its unanimous opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973),[6] cited by appellants, that the burden of proving a nondiscriminatory reason for an employee's rejection shifts to the defendant employer only after the plaintiff employee has sustained the initial burden of establishing a prima facie case of racial discrimination.

Appellant also relies heavily upon *Chance v. Board of Examiners*, 458 F.2d 1167 (2 Cir. 1972), where we affirmed an injunction against the use of certain examinations for supervisory school positions which had a discriminatory effect. Our decision in *Chance*, which involved the conduct of entirely different persons than that involved in the instant case, most assuredly does not support the presumption of racial discrimination upon which Huntley relies.

■ Turning to the facts of the present case, it is true that Huntley was the first black school principal in an overwhelmingly minority school district. Beyond that, how-

---

5. The action was brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983 (1970), and its jurisdictional implementation, 28 U.S.C. §§ 1331(a) and 1343(3) and (4) (1970).

6. Although *McDonnell* dealt with questions of the order and nature of proof in actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1970), by analogy the principles there enunciated are applicable here.

ever, the record is replete with undisputed evidence to justify his termination for reasons having nothing to do with racial discrimination. The fires, disturbances and general chaos at I.S. 33 were factors which the Board understandably and with reason took into consideration. Whatever the merits of the dispute, Huntley's educational philosophy and his views on the proper remedy for the school's chaos fundamentally were at odds with those of Superintendent Rogers. It is significant that Huntley was replaced with another black principal who is getting along with the teachers and is making headway at solving some of the problems facing the school, and is doing so with even less staff than Huntley had. Moreover, five of the Board members who voted to terminate Huntley had resisted attempts three years earlier to have Huntley's original appointment set aside in the state courts as illegal.[7] Beyond all this, Huntley's cavalier invocation of the slogan of racism in support of his salary demands, referred to above, surely casts doubt upon the good faith of his claim of racism.

■ We hold that, even on his own theory, Huntley failed to make out even a prima facie case of discriminatory motive which would shift the burden of justification to the Board. Moreover, the record fully supports the district court's conclusion that he was not terminated for racial reasons.

We affirm the district court's rejection of Huntley's equal protection claim.

### III. DUE PROCESS CLAIM

Huntley also contends that the district court erred in rejecting his due process claim based on the absence of a hearing prior to his termination.

His two-pronged argument in support of this claim is that he was entitled to a fair hearing on the charges against him because he had an expectation of continued employment and because the charges which were publicly announced impaired his chances of future employment. Although we hold the record does not support his claim that he had any reasonable expectation of continued employment as a school principal, we also hold that the circumstances of his termination cast sufficient doubt upon his professional competence as to impair the possibility of his obtaining future government employment.

■ As an acting school principal, Huntley did not have tenure under New York law. Nor did the Board's conduct or representations made to him justify a reasonable expectation that he would not be removed or that he would be terminated only for cause. Cf. *Perry v. Sindermann,* 408 U.S. 593, 599–603 (1972). As to this prong of his due process claim, therefore, we hold that he did not have any "property" interest in continued employment as an acting school principal. *Board of Regents v. Roth,* 408 U.S. 564, 576–78 (1972).

■ We turn next to the other prong of his due process claim, namely, that the likelihood of his obtaining future government employment in a supervisory position has been impaired because of the charges made against him and that his professional reputation has been damaged.

As Justice Jackson stated in his concurring opinion in *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 185 (1953), referring to the discharge of government employees without a hearing:

"To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government so dominates the field of opportunity."

This observation by Justice Jackson was quoted with approval by the Supreme Court

---

7. Shortly after Huntley was appointed acting principal in 1970, the Council of Supervisory Associations of the Public Schools of New York City brought an Article 78 proceeding in the New York state courts to challenge Huntley's appointment under state regulations. The Board refused to withdraw Huntley's appointment in order to settle the litigation. Eventually the Board prevailed. *Matter of Council of Supervisory Associations of the Public Schools of New York City v. Board of Education of the City of New York,* 65 Misc.2d 430, 318 N.Y. S.2d 220 (Sup.Ct., Kings Co., 1971).

in its recent decision, *Paul v. Davis,* 424 U.S. 693, 704 (1976), as in its earlier decision, *Board of Regents v. Roth, supra,* 408 U.S. at 574.

Moreover, the charges which were the basis for discharging Huntley as set forth in Superintendent Rogers' letter of June 1, 1973, *supra* note 4, and which were publicly read at the June 5 meeting, surely stigmatized Huntley within the meaning of *Board of Regents v. Roth, supra.* These charges included statements that Huntley "failed to demonstrate that quality of leadership necessary to effectively deal with the educational program"; that he was responsible for the rapid deterioration of the school; that he "had not provided for the basic safety of the children and staff"; and that his "leadership" had "created a climate of confusion and discontent". Having discharged Huntley with a public statement of these charges, it is unlikely that Huntley would ever have a chance to obtain another supervisory position—in the public schools or elsewhere.

Our holding in this respect is not inconsistent with, but is supported by, *Paul v. Davis, supra.* There two county police chiefs had distributed to local merchants flyers listing the names and showing photographs of persons designated as "active shoplifters." The plaintiff, whose name and photograph appeared in the flyer, had been arrested on shoplifting charges but never convicted. He sued the police chiefs individually in a § 1983 action claiming that his reputation and opportunities for future employment had been damaged in violation of the due process clause. The Supreme Court held that the plaintiff had not alleged a deprivation of "property" or "liberty" within the meaning of the Fourteenth Amendment, stating that "[W]e think that the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clauses of the Fifth or the Fourteenth Amendment." 424 U.S. at 702.

Here, unlike *Davis,* Huntley claims that the public statement of charges against him

and the perpetuation of these charges in his record occurred "in the course of termination of employment," 424 U.S. at 710, and that, as a direct result, he will be denied future employment. The charges set forth in Superintendent Rogers' letter of June 1 which was read publicly by the secretary of the Board go to the very heart of Huntley's professional competence. These charges have become part of Huntley's employment record and have been made a matter of public knowledge deliberately by Superintendent Rogers and the Board members. The Supreme Court in *Davis* again made it clear, as it had in *Roth,* that the protections of the Fourteenth Amendment are available whenever the state, in terminating an individual's employment, makes charges against him that will seriously impair his ability to take advantage of other employment opportunities. 424 U.S. at 701–710.

On the record before us, it is abundantly clear that Huntley's chances of obtaining a supervisory position in the public school system have been drastically impaired. True, Huntley has been rehired as a teacher, but there is a significant difference between a teaching position and a supervisory position.

In the instant case Huntley's property interest in other employment opportunities was also impaired when the Board publicly announced its charges of incompetence without affording Huntley an opportunity to rebut them.

The thrust of the Supreme Court's decision in *Davis* was that not *every* defamation, merely because committed by a state official while abusing his powers, constitutes a violation of due process. The distinction in this respect between *Davis* and the instant case is critical. In *Davis,* state officers had exercised official powers in furtherance of their own designs for purposes clearly beyond the scope of their official responsibilities. Here, by contrast, the hiring and firing of a school supervisor was the responsibility of the Community School Board under state law. The Board and the district superintendent were responsible for evaluating the supervisor's performance. They not merely have exercised official

powers for improper purposes; they have abused state functions which they were charged with implementing. The nub of the distinction between *Davis* and the instant case is perhaps best pointed up by the Court's quotation in *Davis* from its earlier decision in *Board of Regents v. Roth, supra,* 408 U.S. at 573: "[T]here is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 424 U.S. at 709.

■ That is precisely what did happen here.[8]

We hold that Huntley was entitled to a fair hearing prior to the Board's public announcement of charges which might impair his chances of future employment as a school supervisor and which might damage his professional reputation.

We reverse the district court's rejection of Huntley's due process claim.

In remanding for determination of appropriate relief in view of our holding on Huntley's due process claim, we leave this matter to the sound discretion of the district court, including what damages, if any, Huntley may be able to prove that he sustained.

No costs to any party on this appeal.

Affirmed in part; reversed and remanded in part.

---

**8.** Although the Supreme Court stated in *Davis* that the "property" or "liberty" protected by the due process clause ordinarily must flow from a guaranty under state law or the Constitution, *supra,* 424 U.S. 693, at 699–710, the Court's reliance upon *Screws v. United States,* 325 U.S. 91 (1945), makes it clear that this need not always be the case. After noting that the Fourteenth Amendment prohibits "only state action of a 'particular character,' " the Court pointed out that the unlawful beatings involved in *Screws* were perpetrated by law enforcement officers "who made the assault in order to protect themselves and to keep the prisoner from escaping, i. e., to make an arrest effective." 325 U.S. at 110. The Court emphasized that "[The] officers of the state were performing official duties; [and] the power which they were authorized to exercise was misused." *Ibid.*