459 F.3d 207
 Sarrit SEGAL, Plaintiff-Appellant,
v.
CITY OF NEW YORK, Department of Education of the City of New York, Joel Klein, Chancellor of NYC Public Schools, Theresa Europe, Director of the Office of Special Investigations, Thomas Highland, Deputy Director of Special Investigations, Ness Matos, Officer of the Office of Special Investigations, Joseph Ponzo, Assistant Principal, Obdulia Karamanos, Guidance Counselor, John Doe, and Jane Doe, Defendants-Appellees.
Docket No. 05-3211-CV.
 United States Court of Appeals, Second Circuit.
 Argued: June 5, 2006.
 Decided: August 3, 2006.
 
 Edward H. Wolf, Law Offices of Edward H. Wolf, P.C., Bronx, NY, for Plaintiff-Appellant.
 Ann E. Scherzer, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, Kristin M. Helmers, Assistant Corporation Counsel, on the brief), New York, NY, for Defendants-Appellees.
 Before WALKER, Chief Judge, NEWMAN and SOTOMAYOR, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Not every wrong committed at the hands of the government is cognizable as a constitutional violation. In this case, we harbor little doubt that the defendants-appellees committed certain errors during the course of an investigation that ultimately led to the plaintiff-appellant's termination. Whether this constitutes a deprivation of liberty without due process of law, and is therefore cognizable in an action brought under 42 U.S.C. § 1983, is a separate question.
 
 
 2
 The undisputed facts establish that the plaintiff-appellant, an at-will government employee, had available to her an adequate post-termination hearing that accorded with the requirements of due process. Because, in our view, the avilability of this post-termination name-clearing hearing is sufficient to defeat her "stigma-plus" claims,[1] the defendants are entitled to judgment as a matter of law. We therefore affirm the judgment of the district court, which rested on such a holding.
 
 BACKGROUND
 
 3
 In September 2002, plaintiff-appellant Sarrit Segal was appointed a probationary teacher for the New York City Department of Education ("DOE" or "Department") and was assigned to teach kindergarten at P.S. 396 in the Bronx. By all accounts, Ms. Segal appears to have been a good teacher. On her first performance evaluation she received an above-scale rating of "satisfactory plus" and a note from the principal that indicated, "It is a pleasure to have you as a member of our school community." During the following school year, however, an incident occurred in Segal's classroom that prompted an investigation and in turn resulted in her termination.
 
 
 4
 On March 5, 2004, Assistant Principal Joseph Ponzo reported to the DOE's Office of Special Investigations that he had received information that Segal had failed to assist a student (hereinafter "Student A") when that student was attacked by other children in Segal's kindergarten classroom. Although Segal was not immediately removed from her classroom duties, the Office of Special Investigations assigned Ness Matos (a DOE confidential investigator) to investigate the incident.
 
 
 5
 According to Matos's May 6, 2004, report, Segal called the school guidance counselor, Obdulia Karamanos, to report a "riot" in her classroom after she was unable to separate a group of children who were attacking Student A. When Karamanos arrived, she found Segal standing near the children, who were in a circle attacking Student A as that child lay on the floor. Karamanos managed to separate the children and remove Student A from the classroom; she expressed shock because, from her perspective, Segal appeared to have stood by and watched the incident without intervening. In completing his report, Matos also spoke with several students, all of whom were implicated in one way or another in the attack on Student A. The children's ages ranged from five to six. Several of the children stated that Student A had hit them, and that Segal directed them to strike back.[2] Segal denied these allegations; she stated that she tried to stop the children from attacking Student A, and, when that proved impossible, she called for outside help, eventually reaching Karamanos after her calls to the principal and the assistant principal went unanswered. Based on these interviews, Matos chose to believe the story of some of the children; he concluded that "Ms. Segal's claim that she did not instruct the students to hit Student A, and that she did try to stop the hitting[,] is not credible and not supported by witness statements." He recommended that the Department terminate Segal's employment and place her name on the Department's Ineligible/Inquiry List, which would essentially render her ineligible for future employment with the Department.
 
 
 6
 Although the Matos report only made a recommendation, Segal did not wait until her termination but instead responded on June 16, 2004, by filing the instant lawsuit in the United States District Court for the Southern District of New York. In her complaint, she alleged that the defendants deprived her of her liberty without due process of law. She named as defendants the City of New York, the Department of Education, and various Department employees.
 
 
 7
 Shortly after filing her suit, Segal received a letter dated June 30, 2004, in which Joel DiBartolomeo, the Community Superintendent of District 10, informed Segal that he would decide, based on the recommendations in Matos's report, whether to discontinue her services as a probationary employee and terminate her license. DiBartolomeo wrote that his basis for a decision whether to terminate Segal would be the "allegations of corporal punishment inflicted on a kindergarten student"; he indicated that he would render his decision on July 12, 2004. Although Segal failed to submit direct evidence of DiBartolomeo's ultimate decision, the defendants conceded in their answer that Segal "was terminated and placed on an inquiry list." We assume these facts for purposes of deciding the instant appeal.[3]
 
 
 8
 Subsequent to Segal's termination, the United Federation of Teachers, acting on Segal's behalf, filed a C-31 administrative appeal with the Department; apparently, however, the union did not inform Segal that it had done so. Segal was eventually notified of the appeal when the Department's Office of Appeals and Reviews informed her that a hearing was scheduled for December 15, 2004, at which time Segal would have been permitted to challenge her termination, be represented by an advocate selected by her union, present evidence, call witnesses, cross-examine witnesses, and make an oral presentation. On the advice of her counsel, however, Segal indicated in a letter that she had not given anyone permission to pursue the appeal and did not wish to go through with the hearing. As a result, the Department did not hold a hearing.
 
 
 9
 Meanwhile, Segal's federal lawsuit had progressed through discovery, and by December 2004 the parties were on the verge of negotiating a settlement. Negotiations broke down, however, after the New York Post ran a story about the classroom incident and the conclusions in the Matos report. In an affidavit, Segal stated that the article was "emblematic of the deep stigma" associated with the charges in the Matos report and "spooked the offerors from going forward with the settlement." There is no record evidence, however, to suggest that the Department was responsible for "leaking" the Matos report to the Post. The report was attached as an unsealed exhibit to Segal's complaint, filed before the Post ran its article, and thus was a matter of public record.
 
 
 10
 The defendants eventually moved for summary judgment on all three counts in Segal's complaint. The district court (Jed S. Rakoff, Judge) granted the motion. Segal v. City of New York, 368 F.Supp.2d 360 (S.D.N.Y.2005). After noting that "[t]he Due Process Clause of the Fourteenth Amendment prohibits a state actor from depriving a citizen of her life, liberty, or property without due process of law," the district court explained that "[l]oss of reputation can constitute deprivation of a liberty interest when, for example, it occurs in the course of dismissal from government employment," an action we commonly refer to as a "stigma-plus" claim. Id. at 362 (citing Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir.2004)).
 
 
 11
 The district court construed each of Segal's causes of action as predicated on the existence of a stigma-plus claim, id.; this construction has not been challenged on appeal. The district court also noted that Segal had conceded that "she has no due process claim based on any property interest, since she was a probationary employee with no constitutionally protected property interest in her employment." Id. at 362 n. 1. As a result, the district court stated that in order to avoid summary judgment Segal had to "adduce competent evidence from which a reasonable fact-finder could find, first, that the DOE, in connection with terminating Segal, made false, publicly-available statements that impugned plaintiff's professional reputation, and, second, failed to give her adequate due process to clear her name." Id. at 362 (citing Patterson, 370 F.3d at 329-30). The district court concluded that Segal could not meet this standard. Id. Even if Segal could satisfy the first requirement, the district court held she could not meet the second. Id. In the district court's view, Segal had been afforded adequate process, whether by a C-31 administrative appeal or a proceeding brought pursuant to Article 78 of the New York Civil Practice Law and Rules; Segal simply failed to avail herself of either of those options. Id. at 362-63. As a result, the district court granted the defendants' motion and directed the clerk of the court to enter judgment in their favor. Id. at 363-64. This appeal followed.
 
 DISCUSSION
 
 12
 We review de novo an order granting summary judgment. Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Id.
 
 
 13
 Although Segal asserts three principal arguments on appeal, only two merit formal treatment in this opinion. First, with regard to her stigma-plus claims, Segal argues that due process requires a pre-termination name-clearing hearing, based in part on the severity of the accusations leveled against her, and, even if a post-termination hearing will suffice, both the Department's C-31 administrative hearing and an Article 78 proceeding are inadequate for name-clearing purposes. Second, with regard to municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Segal argues that the district court "abused its discretion by failing to address evidence that the Department of Education was indifferent to the need to train its investigators." We address these arguments in turn.[4]
 
 I. Stigma-Plus Claims
 
 14
 Segal has conceded, as she must, that she has no property interest in her continued employment at the Department. As a probationary employee, she did not have "a legitimate claim of entitlement" to her position as kindergarten teacher. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, Segal asserts that her liberty was deprived without due process of law.
 
 
 15
 We have recognized that a probationary employee can "invoke the protections of the Due Process Clause" where that employee has suffered a loss of reputation "coupled with the deprivation of a more tangible interest, such as government employment." Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir.2004). Such an action is referred to as a stigma-plus claim; it involves an "injury to one's reputation (the stigma) coupled with the deprivation of some `tangible interest' or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir.2003).
 
 
 16
 In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim. See Patterson, 370 F.3d at 330. First, the plaintiff "must ... show that the government made stigmatizing statements about [her] — statements that call into question [the] plaintiff's `good name, reputation, honor, or integrity.'" Id. (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir.1980)). We have also said that statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" will satisfy the stigma requirement. Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630-31 (2d Cir.1996).[5] Second, "a plaintiff must prove these stigmatizing statements were made public." Patterson, 370 F.3d at 330 (citing Abramson v. Pataki, 278 F.3d 93, 101-02 (2d Cir.2002)). Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment. Velez v. Levy, 401 F.3d 75, 89 (2d Cir.2005); Patterson, 370 F.3d at 330, 335.
 
 
 17
 We assume, for purposes of this appeal, that Segal has brought forth evidence which demonstrates a deprivation of her liberty interest. Segal was terminated; she also presented facts in support of her claim that she was stigmatized during the course of her termination. The Matos report and Superintendent DiBartolomeo's letter all but accuse Segal of having inflicted corporal punishment upon a student under her care and supervision. Such statements would be highly stigmatizing and damaging to a school teacher. She also has presented evidence that suggests that these statements were placed in her personnel file prior to her termination, where they remain. We have previously held that the placement of statements in an employee's personnel file may satisfy the contemporaneous public disclosure elements of a stigma-plus claim. See Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 45 (2d Cir.1987).
 
 
 18
 Because stigma plus is a species within the phylum of procedural due process claims, however, it is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law. Stated differently, the availability of adequate process defeats a stigma-plus claim. See, e.g., DiBlasio, 344 F.3d at 302 ("`Stigma plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some `tangible interest' ... (the plus), without adequate process." (emphasis added)); see also Valmonte v. Bane, 18 F.3d 992, 1002 (2d Cir.1994) (stating that even where the plaintiff demonstrates that the government has implicated her liberty interest, she "still must show that the procedural safeguards of her interest established by the state are insufficient to protect her rights").
 
 
 19
 Like any procedural due process claim, a stigma-plus claim enforces a limited but important right: the right to be heard "at a meaningful time and in a meaningful manner." Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (internal quotation marks omitted). The limited nature of this right is especially apparent where the plaintiff, like Segal, is an at-will government employee. An at-will government employee may be terminated for cause or for no cause whatsoever. Cf. Roth, 408 U.S. at 577, 92 S.Ct. 2701. She has no right to reinstatement. Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (observing that, since the respondent, a nontenured government employee, "had no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for failing to rehire him presents no federal constitutional question" (footnote omitted)). "[T]he hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate [her] employment is solely to provide the person an opportunity to clear [her] name." Id. at 627, 97 S.Ct. 882 (internal quotation marks omitted); accord Patterson, 370 F.3d at 335-36 (stating that a name-clearing hearing "gives the plaintiff an opportunity to hear and answer first-hand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation"); Donato, 96 F.3d at 633 ("A hearing must be held for the limited purpose of giving a discharged employee an opportunity to clear her name.").[6] Of course, this all raises the familiar question in any procedural due process case: What process is adequate? What process is due?
 
 
 20
 In Patterson, we strongly suggested that, in the case of an at-will government employee, a post-termination name-clearing hearing is sufficient to protect the sort of liberty interests presented in a stigma-plus claim. 370 F.3d at 335. Specifically, we stated that "[t]he appropriate remedy for a stigma-plus claim premised on a plaintiff's termination from at-will government employment is a post-deprivation name-clearing hearing." Id. We also noted that "[a] post-deprivation name-clearing hearing may defeat a plaintiff's stigma-plus claim, so long as the hearing is adequate for due process purposes." Id.
 
 
 21
 The jury in Patterson had found that, even though the plaintiff's liberty interests were implicated during the course of one of his dismissals from government employment, the defendants were not liable for any damages because they had provided the plaintiff with an adequate, post-termination hearing. Id. at 327, 334. After setting out the statements recounted above, which related to the timing of the hearing, we analyzed separately whether the procedures afforded at the hearing were adequate to meet the demands of the Due Process Clause. Id. at 336-37. We held that they were not. Id. at 337. Because the defendants had failed, as a matter of law, to provide the plaintiff with a procedurally adequate hearing at which he could clear his name, we reversed the portion of the jury's verdict that related to this claim and remanded the case for a new trial on damages. Id.
 
 
 22
 As we later recognized in Velez, Patterson did not actually decide whether a pre- or post-termination hearing is required in the case of an at-will employee. See Velez, 401 F.3d at 92 n. 16 ("Because [the procedural inadequacies] alone sufficed to support a procedural due process violation claim, our holding did not — and could not — address the need for additional pre-removal process . . . ."); Patterson, 370 F.3d at 336-37. Despite Patterson's strong suggestion that a post-deprivation hearing would not offend the Due Process Clause, it is still an undecided question in this circuit whether the availability of an adequate post-termination name-clearing hearing is sufficient to defeat an at-will employee's stigma-plus claim, or whether due process demands a pre-termination hearing.
 
 
 23
 We now hold that, in this case involving an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim and that the procedures available at the C-31 hearing were adequate to protect Segal's reputational and professional interests. Due process does not require a pre-termination name-clearing hearing on the facts in this case. Our decision results from applying the familiar balancing test articulated in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). See Ciambriello v. County of Nassau, 292 F.3d 307, 320 (2d Cir.2002) ("While Mathews involved social security disability benefits, we apply the Mathews balancing test in the context of government employment."); see also Patterson, 370 F.3d at 336-37 (analyzing the adequacy of the process afforded at a name-clearing hearing under the Mathews balancing test).
 
 
 24
 Although Mathews involved a very different interest, social security disability benefits, it presented a similar question: Whether due process required a pre-deprivation hearing. 424 U.S. at 323, 96 S.Ct. 893. In resolving that question, the Supreme Court set forth a three-part test for evaluating whether the process afforded by the government is constitutionally adequate: (1) "the [nature of the] private interest that will be affected by the [governmental] action"; (2) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"; and (3) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." Id. at 335. "A court must balance these factors to determine what type of procedures would assure fairness in a particular case." Patterson, 370 F.3d at 336.
 
 
 25
 The private interests presented by Segal, an at-will employee, are her "reputational interest, and how that interest can effect [her] standing in the community and [her] future job prospects." Patterson, 370 F.3d at 336. In contrast, a tenured government employee would have interests in both her reputation and her right to continued employment. Codd, 429 U.S. at 627-28, 97 S.Ct. 882.
 
 
 26
 The government interest at stake in a stigma-plus claim is its ability to execute and explain its personnel decisions quickly. See Baden v. Koch, 799 F.2d 825, 831 (2d Cir.1986) ("An executive who fails to act when the facts demand action will often be taken to task by the legislature, the media and the public for the continued shortcomings of his subordinates."); see also Graham v. City of Philadelphia, 402 F.3d 139, 147 (3d Cir.2005) (explaining that "[t]he government has a strong interest in preserving its officials' ability to make personnel decisions and communicate the reasons for those decisions to the public"); Patterson, 370 F.3d at 336 (stating that government's interest is that "of an executive officer to make and explain important personnel decisions"). This interest is heightened in the case of an at-will employee. The government has wide latitude when it comes to retaining or dismissing such employees. See Codd, 429 U.S. at 628, 97 S.Ct. 882. Traditionally, the government has used this latitude to establish a probationary, at-will period before affording such employees the rights and privileges associated with tenured employment, including the right to a pre-termination hearing, see, e.g., Roth, 408 U.S. at 577, 92 S.Ct. 2701.
 
 
 27
 As for the third factor, we have said that "[t]he risk inherent in a stigma-plus claim is the risk that the false charges against the plaintiff will go unrefuted and that [her] name will remain stigmatized." Patterson, 370 F.3d at 336. The risk will vary depending on the effectiveness of the procedures available and the promptness by which they are afforded.
 
 
 28
 Chancellor's Regulation C-31 sets out the procedures under which a non-tenured Department employee may be terminated. This regulation provides that the District Superintendent must notify the Department's Office of Appeals and Reviews of the need to terminate a non-tenured employee. The Office of Appeals and Reviews will then convene a "Technical Assistance Conference," without the employee's participation, at which the conferees review the relevant facts provided by the Superintendent to determine whether it is advisable to fire the employee. The conferees submit their recommendation to the Chancellor. If the Chancellor accepts a recommendation to terminate the employee, he may issue a notice of discontinuance, at which point the employee is formally terminated by the Department, or he may simply indicate his intent to terminate the employee. Either way, the Chancellor must provide the employee with the specific reasons for his decision. The employee has 15 school days from the date of service in which to appeal the Chancellor's decision either terminating her employment or expressing an intent to do so. During the pendency of the review, an employee who has not been terminated is suspended without pay. Thus, the C-31 regulation provides for pre- or post-termination review, depending on whether the Chancellor determines that, in a given case, immediate dismissal is warranted.
 
 
 29
 The C-31 regulation provides for extensive procedures to review the Chancellor's initial decision: (1) the right to a hearing, if the employee requests one; (2) notice, at least three weeks before the hearing, of the time, date, and place of the hearing; (3) written notice of the employee's rights at the hearing; and the rights (4) to be represented by an advocate selected by the employee's union, (5) to present all relevant evidence, (6) to call witnesses on the employee's behalf, (7) to cross-examine witnesses, and (8) to make an oral presentation. The hearing must be held within one year of the employee's request for a hearing. At the hearing, the Department must present evidence to support its decision but is not obligated to call witnesses. The Chancellor is authorized to uphold his previous decision to terminate, to execute his previous intention to terminate, or to reinstate the employee. The employee is notified in writing of the Chancellor's decision.
 
 
 30
 In our view, the procedures available at the hearing were sufficient to safeguard Segal's reputational and professional interests. The C-31 regulation provides her with the means necessary to clear her name, including the opportunity to present evidence, call witnesses, cross-examine witnesses, and make an oral presentation through union-selected counsel. Moreover, the regulation does not specifically preclude her from being represented by her own counsel.
 
 
 31
 Although a pre-termination hearing would provide Segal with the opportunity to refute any stigmatizing statements prior to her entry into the job market, such a hearing comes at too high a cost to the government. The government's important interests — in both explaining its employment decisions and exercising its right to terminate an at-will employee immediately — would be unduly impaired if we were to require a pre-termination hearing in such circumstances. Indeed, accepting Segal's argument would effectively mandate that the government hold a pre-termination hearing any time it provided an explanation why it decided to fire an at-will employee. If the government offered such an explanation, and that explanation implicated the employee's reputational or professional interests, as would usually be the case, the government would have to hold a pre-termination hearing or risk being haled into court, where the plaintiff need only raise the issue of falsity in order to state a claim. Brandt, 820 F.2d at 43. Such a rule would provide the government with a powerful incentive to forgo any explanation of its termination decisions, at a cost to the public as well.
 
 
 32
 1 Because an at-will employee lacks a property interest in continued employment, she has no right to a particular outcome following an adequate name-clearing hearing; the government is simply required to provide her with an opportunity to salvage her name. See Codd, 429 U.S. at 627-28, 97 S.Ct. 882. In our view, there is no reason to believe that this limited right — a meaningful opportunity to clear one's name — cannot be adequately vindicated at a reasonably prompt, post-termination name-clearing hearing. See id.; see also Doe v. U.S. Dep't of Justice, 753 F.2d 1092, 1112-13 & n. 25 (D.C.Cir.1985) (holding that the plaintiff, an at-will employee who was never afforded an opportunity to refute potentially defamatory charges during the course of her termination, was entitled to a name-clearing hearing but disavowing any suggestion that the court's holding compelled such a hearing prior to the plaintiff's termination from government employment).[7]
 
 
 33
 Our case law does not compel a contrary result. Segal relies on both Velez v. Levy, 401 F.3d 75 (2d Cir.2005), and DiBlasio v. Novello, 344 F.3d 292 (2d Cir.2003), for the proposition that she is entitled to a pre-termination hearing. Although we stated that a pre-deprivation hearing was required in both of these cases, neither case involved the sort of liberty interest presented by Segal, an at-will employee. See Velez, 401 F.3d at 92; DiBlasio, 344 F.3d at 302; see also Mathews, 424 U.S. at 334, 96 S.Ct. 893 (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands" (alteration and quotation marks omitted)). In Velez, we recognized that the plaintiff, a public official who could only be removed for cause, had an interest analogous to that of a property right. Velez, 401 F.3d at 85-86 (recognizing that the plaintiff, an elected member of a school board, could "only be removed by the Chancellor for cause" and enjoyed "statutory restrictions [from] removal" but holding that the plaintiff "lack[ed] a constitutionally cognizable property interest in her elected office" only because "`public offices are mere agencies or trusts, and not property'" (quoting Taylor v. Beckham, 178 U.S. 548, 577, 20 S.Ct. 890, 44 L.Ed. 1187 (1900))). Similarly, in DiBlasio, the plaintiff complained about the deprivation of a distinct interest, the summary suspension of his medical license. DiBlasio, F.3d at 294-95. Because neither case involved an at-will government employee, but instead presented interests that the government could deprive only through a showing of cause, we also had no occasion to address the government's strong interest in preserving its ability to dismiss an at-will employee without first providing a hearing. Cf. Mathews, 424 U.S. at 334, 96 S.Ct. 893 (stating that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances" (alteration and quotation marks omitted)).[8]
 
 
 34
 Although Huntley v. Community School Board, 543 F.2d 979 (2d Cir.1976), involved an at-will employee, we do not read Huntley to require that such employees receive a pre-termination hearing. The plaintiff, a probationary school principal, was terminated by a vote of the school board after he was publicly charged with incompetence. Id. at 980, 982-83. The board, however, never afforded the plaintiff an opportunity to rebut the charges. Id. at 980-83, 985-86. Thus, with regard to the plaintiff's stigma-plus claims, the question before the court was whether the defendants violated the Due Process Clause by failing to provide the plaintiff with any process at all. See id. at 983 (explaining that the plaintiff was not afforded "an opportunity to respond to the public reading of the charges against him nor to challenge them by calling witnesses"); see also id. at 985 (stating that the plaintiff's "interest in other employment opportunities was . . . impaired when the Board publicly announced its charges of incompetence without affording Huntley an opportunity to rebut them").
 
 
 35
 "We reverse[d] the district court's rejection of Huntley's due process claim." Id. at 986. We also stated, "We hold that Huntley was entitled to a fair hearing prior to the Board's public announcement of charges which might impair his chances of future employment as a school supervisor and which might damage his professional reputation." Id. Although we characterized that statement as a holding, we believe it was, in truth, dictum. Our observation in Velez, in which we recognized the limited nature of our holding in Patterson, is equally applicable to Huntley: Because the defendants failed to provide the plaintiff with any process, the timing of that process was not necessary to the decision. See Velez, 401 F.3d at 92 n. 16 ("Because [the procedural inadequacies] alone sufficed to support a procedural due process violation claim, our holding [in Patterson] did not — and could not — address the need for additional pre-removal process. . . ."). Moreover, even if our pronouncement were not dictum, we would be reluctant to accord authoritative weight to a decision decided so soon after Mathews that neither references nor applies the operative balancing test announced in that case. Compare Huntley, 543 F.2d at 979 (decided on May 12, 1976), with Mathews, 424 U.S. at 319, 96 S.Ct. 893 (decided on February 24, 1976). The application of the Mathews balancing test in the context of government employment is now firmly established in this circuit. See, e.g., Patterson, 370 F.3d at 336-37; Ciambriello, 292 F.3d at 319-20. As a result, we do not consider ourselves bound by our statement in Huntley.[9]
 
 
 36
 In sum, we hold that, in the context of an at-will government employee, a reasonably prompt, post-termination name-clearing hearing satisfies constitutional due process as long as the procedures afforded at such a hearing are sufficient to protect the employee's reputational and professional interests. The availability of such a hearing in this case defeats Segal's stigma-plus claims. Accordingly, there is no need to address Segal's arguments that (1) an Article 78 proceeding was somehow not available to her and (2) such a proceeding is inadequate for name-clearing purposes.[10]
 
 II. Municipal Liability Under Monell
 
 37
 Segal also argues that the district court "abused its discretion" when it failed to address evidence that would lend support to her theory of liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). She appears to argue that Matos's inadequate investigation was the result of the Department's failure to properly train its investigators and this failure to train is an independent constitutional violation. We know of no case that supports such a broad reading of Monell.
 
 
 38
 Monell does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation. See Monell, 436 U.S. at 694, 98 S.Ct. 2018 (involving a policy that was "the moving force of the constitutional violation"); see also City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (involving a failure to train municipal employees that led to the constitutional injury). The district court recognized as much when it heard oral argument on the defendants' motion for summary judgment: "Well, if the due process claim fails, [then I] don't reach Monell." Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.
 
 
 39
 To be sure, the Department's alleged failure to train its investigators could have contributed to at least two significant errors underlying the Matos report. First, the Matos report rested principally upon statements obtained from five children implicated in the attack on Student A. Nowhere does Matos account for the strong incentive on the part of these five- and six-year-olds to shift the blame to Segal. Second, the report accepts the statements made by these small children as the truth without detailing the method by which Matos questioned the children, stating whether leading or suggestive questions were used, providing a record of the interviews, accounting for material inconsistencies among the statements, or providing accounts of other children not implicated in the altercation. The veracity of the students' accounts remains an unresolved question.
 
 
 40
 Even if these errors were the result of the Department's failure to train its investigators and that failure led directly to Segal's termination, that failure has little to do with the theory of liability that she advances. The Department's failure to train its investigators is not directly related to the adequacy of the process afforded by the Department at the post-termination name-clearing hearing. Although the failure to train may increase the risk that an erroneous deprivation might go unrefuted, the procedures available at the C-31 hearing are sufficient to mitigate that risk. At the C-31 hearing, Segal could have cross-examined Matos as to the adequacy and methods of his investigation and pointed to any training he lacked, presented witnesses on her own behalf, and made all the training-related arguments she now advances.
 
 
 41
 Because any purported failure to train has at best marginal relevance to the merits of Segal's procedural due process claims, the district court did not err in refusing to consider it.
 
 CONCLUSION
 
 42
 For the foregoing reasons, the judgment of the district court is AFFIRMED. The parties shall bear their own costs.
 
 
 
 Notes:
 
 
 [1]
 "`Stigma plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some `tangible interest' [e.g., the loss of government employment] or property right (the plus), without adequate process." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir.2003).
 
 
 [2]
 Matos's report indicates that at least one student heard Segal state, "No hitting, Student A, she had enough." We also note that, during the course of discovery in this matter, the parties deposed a student-witness not interviewed by Matos who indicated that Segal directed the students to "get off" Student A
 
 
 [3]
 The City of New York now contends in their appellate brief that Segal was in fact never placed on the inquiry list — a contention to which Segal strenuously objects. This disputed fact, however, does not materially affect our decision here since, as noted above, we assume for the purposes of this appeal that the City placed her on the Ineligible/Inquiry list
 
 
 [4]
 For her third argument, as best as we can understand it, Segal argues that, even if we determine that the district court did not err in granting the defendants' motion for summary judgment, we should exercise our "equity jurisdiction" to somehow lift the prejudicial effect of the district court's judgment, because her counsel "could [not] have foreseen" that the district court was going to grant the defendants' motion. We reject this argument as frivolous. Summary judgment results in exactly what its name suggests — a judgment on the merits. Segal's counsel was apprised that his client could lose her case, and forfeit any other claims associated with her termination, when the defendants made their dispositive motion
 
 
 [5]
 "A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false."Patterson, 370 F.3d at 330; see also Brandt v. Bd. of Coop. Educ. Servs., 820 F.2d 41, 43-44 (2d Cir.1987) ("If Brandt had to prove the falsity of the charges before he could obtain a hearing, there would be no need for the hearing." (emphasis removed)).
 
 
 [6]
 Where an at-will employee disagrees with the outcome reached at an otherwise adequate name-clearing hearing, she may have non-constitutional avenues in which to seek redress. For example, state law may provide her an opportunity to petition a court to review the name-clearing panel's adverse determinationSee, e.g., N.Y. C.P.L.R. art. 78.
 
 
 [7]
 We need not decide what constitutes a reasonably prompt post-termination hearing. Although Segal's C-31 appeal was scheduled some four or five months after she was terminated, she made no effort to expedite the process. Instead, she chose to waive her right to a hearing. Nothing in the regulations that establish the C-31 hearing would prevent the Department from offering a name-clearing hearing within a time sufficient to protect an at-will employee's reputational and professional interests
 
 
 [8]
 This case also does not present the kind of liberty interest involved inZinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), one arising from involuntary commitment to a mental institution, in which the Supreme Court held that a pre-deprivation hearing was required, id. at 123-24, 110 S.Ct. 975.
 
 
 [9]
 After we decidedHuntley the Supreme Court also recognized in Codd that an at-will employee does not vindicate the same rights at a name-clearing hearing as a tenured employee. Codd, 429 U.S. at 627-28, 97 S.Ct. 882.
 
 
 [10]
 In the "Statement of Case" section of her brief, and again at oral argument, Segal argued that the district court faulted her for not exhausting her administrative remedies. She citesGoetz v. Windsor Central School District, 698 F.2d 606 (2d Cir.1983), apparently for the proposition that a "plaintiff's failure to take advantage" of an administrative hearing "does not constitute a waiver of [her] right to assert a due process claim," id. at 610. We agree with this statement, as a general matter, but read the district court's opinion as properly concluding that Goetz is beside the point. See Segal, 368 F.Supp.2d at 363 n. 2. Goetz held that, on a motion to dismiss, where an administrative remedy might be inadequate, the "[f]ailure to take advantage of that procedure may not . . . be interpreted as a waiver of the full due process to which [the plaintiff] would be entitled." Goetz, 698 F.2d at 610 (emphasis added). In contrast, where, as here, the plaintiff had available adequate process, she cannot be said to have been "deprived of due process simply because [she] failed to avail [herself] of the opportunity." Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir.1996) (internal quotation marks omitted). The district court recognized this distinction. See Segal, 368 F.Supp.2d at 363 & n. 2. Goetz is simply not on point.